[No. B161431. Second Dist., Div. One. Nov. 25, 2003.]

LOTTIE NELSON, Individually, and as Co-Personal Representative, etc., Plaintiff and Appellant; WALLACE NELSON, Plaintiff and Respondent, v. COUNTY OF LOS ANGELES et al., Defendants and Appellants.

COUNSEL

Lloyd W. Pellman, County Counsel, Dennis M. Gonzales, Principal Deputy County Counsel, Elizabeth D. Miller, Deputy County Counsel; Greines, Martin, Stein & Richland, Timothy T. Coates and Alan Diamond for Defendants and Appellants.

Law Offices of Leo James Terrell and Leo James Terrell for Plaintiff and Appellant.

David E. Frank for Plaintiff and Respondent.

OPINION

**VOGEL (Miriam A.), J.**—On a summer night in 1998, Dwayne Nelson (an adult who had just been released from prison) stood in the middle of a busy intersection and fired a loaded gun into the air and at passing motorists.

Someone called 911, and the Los Angeles County Sheriff's Department responded. Dwayne was handcuffed with his hands behind his back and placed in the back of a patrol car. He started thrashing about, and the deputies pulled him out of the car, laid the still-handcuffed Dwayne facedown on the ground, and executed a "total appendage restraint procedure" (TARP).[1] By the time the deputies finished, Dwayne was unconscious. When they rolled him over, he was no longer breathing and the paramedics who came to the scene were unable to revive him. The entire episode was captured on videotape.

Dwayne's parents, Lottie Nelson and Wallace Nelson, sued the County of Los Angeles (and the sheriff's department and individual deputies, all of whom are included in our references to the County) for their son's allegedly wrongful death.[2] The County answered, discovery ensued, and the case ultimately proceeded to trial.[3] A jury found the County was negligent, that the County's negligence was the cause of Dwayne's death, and that 35 percent of the negligence was attributable to Dwayne's conduct. The jury awarded $2 million to the Nelsons, which was reduced by the 35 percent to $1,300,000. The County's motions for a new trial and for judgment notwithstanding the verdict were denied, as was a motion by the Nelsons for attorneys' fees. The County appeals and Mrs. Nelson has filed a cross-appeal.

We reject the County's challenge to the Nelsons' standing to prosecute this action, reject the County's contention that the Nelsons failed to prove causation, agree with the County that the damages awarded by the jury were excessive, reject Mrs. Nelson's claim that she was entitled to recover her attorneys' fees on a private attorney general theory, and reject her contention that the government tort claim she filed for herself was sufficient to preserve a claim for damages by Dwayne's estate. We reverse the award of damages, remand for a new trial of that issue, and otherwise affirm the judgment.

---

[1] "Tarping is commonly called hog-tie where they tie their wrists and ankles together to restrain them," that is, "when you utilize a leather strip with hooks on it to secure their wrists and ankles."

[2] Lottie Nelson and Wallace Nelson (who were divorced years ago) filed separate claims with the County but then filed a joint complaint (albeit represented by separate counsel) in which they sued individually and as the joint administrators of Dwayne's estate. Although they have filed separate briefs on appeal, their positions are the same vis-à-vis their response to the County's appeal, and we refer to them collectively in addressing the County's issues. Mrs. Nelson has filed a cross-appeal but Mr. Nelson has not, and we thus refer only to Mrs. Nelson in addressing her issues.

[3] On the way to trial, a dispute arose about the County's obligation to preserve recordings of telephone and radio communications for more than 100 days, and that dispute resulted in our opinion in *Nelson v. Superior Court* (2001) 89 Cal.App.4th 565 [107 Cal.Rptr.2d 469]. There was also a motion for summary judgment by the County against the Nelsons in their representative capacities, and that motion was granted. The writ proceeding and the summary judgment motion are discussed in the context of Mrs. Nelson's appeal.

## DISCUSSION

## I.

The County contends the judgment must be reversed because the Nelsons lacked standing to bring a wrongful death action. We disagree.

### A.

During a pretrial conference, the County filed a "Request for Determination of Preliminary Fact" in which it asked the trial court to determine that the Nelsons lacked standing to prosecute this action because some of Dwayne's prison records refer to statements by him in which he said he had children. Although it is undisputed that the Nelsons were Dwayne's parents, and although no one else has ever asserted a claim to Dwayne's estate or to any relationship with him, the County's position was and is that the Nelsons had the affirmative obligation to prove that Dwayne was not survived by a spouse or child. The County said the issue had to be determined by the court before they could proceed to the merits of the Nelsons' wrongful death claim.[4]

The trial court agreed, and a hearing was held at which the Nelsons (without objection) presented Mrs. Nelson's deposition testimony to establish that Dwayne (who was about 40 at the time of his death) never married and never had any children. To dispute that fact, the County presented some of Dwayne's prison records to show that he had at various times over a period of eight or ten years told prison employees that he had one, or sometimes two, or sometimes three children. In rebuttal the Nelsons presented conflicting prison records to show that Dwayne had at other times told various prison officials that he never married and did not have any children.

At the conclusion of the hearing, the trial court found the prison records were inadmissible hearsay because the statements made to the prison employees were simply not trustworthy. As the court put it, Dwayne sometimes said "he was single and [other times] that he was married and that he was divorced, that he had no kids, that he had one kid, that he had two kids, that he had three kids." There was also the fact that the prison records stated that Dwayne "suffered from hallucinations, [and] that he was . . . a narcotics addict." The trial court concluded that the Nelsons had established their standing.

---

[4] The County refers to this as an "Evidence Code section 402 hearing," but argues somewhat inconsistently that standing is an element of the plaintiff's case in a wrongful death action, not a foundational fact. We see no need to gnaw at names and base our decision on the fact that the court, the lawyers, and the parties plainly understood that the court's decision on the standing issue would be binding on the jury.

## B.

Subdivision (a) of section 377.60 of the Code of Civil Procedure provides that a cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf: "The decedent's surviving spouse, domestic partner, children, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession."[5] ▪ Because the right to sue for wrongful death damages is strictly a creature of statute and exists only so far and in favor of such persons as the Legislature has declared (*Justus v. Atchison* (1977) 19 Cal.3d 564, 575 [139 Cal.Rptr. 97, 565 P.2d 122], disapproved on another ground in *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 171 [216 Cal.Rptr. 661, 703 P.2d 1]), "standing" among multiple claimants is determined by statutory rank.[6]

It was and is undisputed that the Nelsons were Dwayne's parents, and we consider it safe to assume now, more than five years after Dwayne's death, that no lost child or missing spouse is likely to come forward to assert a claim against the County or anyone else.

## C.

▪ We agree with the County that a wrongful death plaintiff must plead and prove standing (*Jolley v. Clemens* (1938) 28 Cal.App.2d 55, 73–76 [82 P.2d 51]; *Coats v. K-Mart Corp.* (1989) 215 Cal.App.3d 961, 968–970 [264 Cal.Rptr. 12]; *Davis v. Southern Arizona F. Lines, Ltd.* (1938) 30 Cal.App.2d 48, 49 [85 P.2d 897]; *Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 654 [51 Cal.Rptr.2d 907]), but disagree with the County's assertion that

---

[5] Undesignated section references are to the Code of Civil Procedure.

[6] The statute limits the right of recovery to a class of persons who, because of their relation to the deceased, are presumed to be injured by his death (*Fiske v. Wilkie* (1945) 67 Cal.App.2d 440, 444 [154 P.2d 725]), and bars claims by persons who are not in the chain of intestate succession. (*Villacampa v. Russell* (1986) 178 Cal.App.3d 906, 908–909 [224 Cal.Rptr. 73] [a former spouse is not an heir and thus has no standing]; *Phraner v. Cote Mark, Inc.* (1997) 55 Cal.App.4th 166, 168 [63 Cal.Rptr.2d 740] [an adopted child has no standing to sue for the wrongful death of her biological mother]; *Von Batsch v. American Dist. Telegraph Co.* (1985) 175 Cal.App.3d 1111, 1119 [222 Cal.Rptr. 239] [decedent's employer may not seek wrongful death damages]; *Steed v. Imperial Airlines* (1974) 12 Cal.3d 115 [115 Cal.Rptr. 329, 524 P.2d 801] [stepchild not then in line of succession cannot sue for wrongful death damages]; *Nieto v. City of Los Angeles* (1982) 138 Cal.App.3d 464, 470 [188 Cal.Rptr. 31] [fiancée cannot sue for wrongful death damages]; *Garcia v. Douglas Aircraft Co.* (1982) 133 Cal.App.3d 890 [184 Cal.Rptr. 390] [meretricious spouse cannot sue for wrongful death damages]; *Mayo v. White* (1986) 178 Cal.App.3d 1083, 1088–1089 [224 Cal.Rptr. 373] [minor decedent's siblings not heirs under intestacy provisions and thus not proper plaintiffs in wrongful death action].)

the Nelsons failed to do so in this case—because Mrs. Nelson's uncontradicted testimony constitutes substantial evidence that her adult child had no children.

To avoid this conclusion, the County offers up a series of arguments which we reject seriatim.

First, the County says the Nelsons should have sought more evidence—that they should have hired investigators and searched public records for birth certificates and the like. We disagree. The County offers no authority to support this claim, and we know of none. It would be one thing to require additional proof if a known heir asserted a competing claim, but it is quite another to require the parents of a deceased adult child to disprove an unsubstantiated claim that the decedent might at some time, in some unknown place, have had a child. In short, the mother's uncontroverted testimony is sufficient.

Second, the County complains that the trial court refused to admit the prison records into evidence. Assuming the prison records and the statements reported in those records were admissible under a sufficient number of exceptions to the hearsay rule, the trial court's reason for excluding them— that they were untrustworthy because Dwayne sometimes said he was single, other times that he was divorced, sometimes that he had "no kids," other times that he had one "kid," two "kids," or three "kids," and because Dwayne, a drug addict, suffered from hallucinations—means the court, had it admitted the documents, would have found them incredible, rejected them on that ground, and resolved the "conflict" in favor of the Nelsons. This is a nonissue.

Third, the County complains about the Nelsons' failure to introduce any evidence of standing to the jury, and simply ignores the fact that it waived its right to a jury determination of the standing issue when it invited the court to treat standing as a preliminary fact to be determined by the court before trial. We summarily reject this argument on the ground that, in law as in life, you can't have your cake and eat it too.

The Nelsons established their standing to pursue this action.

## II.

The Nelsons' theory of causation was that Dwayne died from positional asphyxia due to the use of the TARP, and their expert, John Cooper, M.D., testified in support of that theory. The County attacks Dr. Cooper's opinion, contending his purported "admissions" that other things could have caused

Dwayne's sudden death mean that causation was not proved with sufficient certainty. (*Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1507 [7 Cal.Rptr.2d 608] [the plaintiff in a wrongful death action must prove the defendant's conduct was a substantial factor in causing the decedent's death]; *Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456] [causation must be proved "within a reasonable medical probability"].) The County is wrong.

## A.

Dr. Cooper, a forensic pathologist who at the time of trial had performed more than 1,500 autopsies, testified that it was his opinion that Dwayne "died as a result of positional asphyxia": "For one thing he is face down in . . . a prone position [and, as the videotape made by the deputies shows,] his face is against the ground. And at one point one of the officers has a knee on his head. . . . So there is probably some small element[] in this case of actual obstruction of the airways. . . . [T]hat is not the main problem here. [¶] The main problem . . . is that the chest has to expand or we can't breathe. And there [are] several elements of chest expansion. And in this case, there is a big need for breathing because the subject is very agitated, worked up, and he is burning a lot of energy. [¶] . . . The diaphragm—when we breathe in, the diaphragm moves down . . . to create kind of a vacuum and the air comes into the lungs. But when we are excited and we are working and fighting for air, then we also use what are known as the intercostal muscles which are the muscles between the ribs. So between the diaphragm and the costal muscles, we create this bigger space that air's being flow[n] into and flown out to.

"In this kind of mechanical asphyxia, the problem is, first of all, the prone position makes it a little bit difficult, and then you've got some degree of weight of the officers [with] at least one of them . . . kneeling on his chest [*sic*] and that compromises the ability of the chest to expand by action of the intercostal muscles. We are also dealing with a fairly large person with . . . quite a bit of contents [in] his abdominal cavity which tend to, if you are in a prone position, tends to push the diaphragm up and not allow the diaphragm to come down. [¶] . . .

"Being forced down in a prone position pushes . . . all contents up further against the diaphragm. So this is really our main problem, and this is the primary problem in that the chest can't expand diaphragmatically and it can't expand with intercostal muscle action. Finally, then we have the hands behind, and then we are bringing the legs up locking and tying them to the hands in this hog-tying procedure which, by immobilizing the shoulders in this way, it just accentuates these other elements of the chest not being able to

expand. [¶] And that is why the hog-tying procedure is so dangerous because it really locks in that fixedness of the chest cavity. And so this is what positional asphyxia is . . . ."

Dr. Cooper testified that Dwayne had a mildly enlarged heart, but disagreed with the opinion expressed in the autopsy report that Dwayne had died as the result of that coronary anomaly ("I don't think it really played a factor"). Dr. Cooper also testified that Dwayne had an artery anomaly, but opined that it "didn't play a factor" in causing his death. As Dr. Cooper put it, "we have a known cause of death. It is asphyxia. . . . [¶] . . . It is the equivalent to having a situation where somebody is being strangled by somebody and then they die, and the autopsy shows they have coronary artery disease and then concluding that they died of coronary artery disease. [¶] Well, in fact, they were being strangled at the time they died." Finally, Dr. Cooper testified that Dwayne was intoxicated by cocaine at the time of his arrest, but opined that the cocaine did not contribute to the cause of death.

■ In short, it was Dr. Cooper's opinion that, had Dwayne not been subjected to the TARP procedure, he would not have died on the day of his arrest, and the fact that Dr. Cooper rejected the County's claims of causation—the enlarged heart, the artery anomaly, and the cocaine—does not render Dr. Cooper's expert medical opinion unreasonable. (*Roddenberry v. Roddenberry, supra,* 44 Cal.App.4th at p. 652.) No more was required to prove causation. (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 481 [50 Cal.Rptr.2d 785].)[7]

## B.

In a related argument, the County contends Dr. Cooper was not competent to give his opinion about the cause of death because he was not present at the autopsy, and because he did not base his opinion on reliable evidence. We disagree. Dr. Cooper based his opinion on the videotape of Dwayne's death, the coroner's autopsy reports and photographs, the report of another pathologist who performed a postmortem examination of Dwayne at the Nelsons' request, Dwayne's records from the Department of Corrections, and the deposition testimony given by several of the deputies. No more was required. (Evid. Code, §§ 801, 802.)

---

[7] We summarily reject the County's assertion that causation had to be proved to a "medical certainty." As the cases cited by the County explain, it is a "reasonable medical probability" that is required, no more and no less. (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 133 [39 Cal.Rptr.2d 658].)

## III.

In related arguments, the County contends the damage award is not supported by substantial evidence, is excessive as a matter of law, includes a type of damages not permitted in a wrongful death action, and resulted from jury misconduct. We agree that the amount of damages is not supported by substantial evidence, and therefore do not reach the jury misconduct issue. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614 [103 Cal.Rptr.2d 492] [the contention that the evidence does not support the award of damages in a wrongful death action is reviewed under the substantial evidence standard].)

### A.

■ A plaintiff in a wrongful death action is entitled to recover damages for his own pecuniary loss, which may include (1) the loss of the decedent's financial support, services, training and advice, and (2) the pecuniary value of the decedent's society and companionship—but he may *not* recover for such things as the grief or sorrow attendant upon the death of a loved one, or for his sad emotions, or for the sentimental value of the loss. (*Overly v. Ingalls Shipbuilding, Inc.* (1999) 74 Cal.App.4th 164, 176 [87 Cal.Rptr.2d 626]; *Ure v. Maggio Bros. Co., Inc.* (1938) 24 Cal.App.2d 490, 496 [75 P.2d 534]; *Krouse v. Graham* (1977) 19 Cal.3d 59, 68–69, 72 [137 Cal.Rptr. 863, 562 P.2d 1022].)

### B.

The evidence establishes these facts: Dwayne was born in 1957, in Chicago. In 1969, when Dwayne was about 12 years old, Mr. and Mrs. Nelson separated. In 1970, Mrs. Nelson and Dwayne moved to Tennessee. When he was 18, Dwayne left Mrs. Nelson's home and ended up in California. *It is undisputed that Dwayne did not see either of his parents at any time during the 20 years preceding his death.* Indeed, at the time of Dwayne's death in 1998, neither Mr. nor Mrs. Nelson knew his address or telephone number. They did not know he had been incarcerated for substantial periods of time, did not know about his medical problems, did not know about his drug addiction, could not name any of his friends, and did not receive any financial support from him.

Charitably put, Dwayne's future financial prospects at the time of his death were limited. He was recently paroled (he had been in and out of prison several times during the preceding 20 years) and addicted to cocaine, and was sufficiently deranged to stand in the middle of a busy intersection, shooting a loaded gun into the air and at passing motorists. Had he survived the arrest, it is more probable than not that (as an expert testified at trial) he would have

been convicted of several felonies and sentenced to state prison for up to 21 years (there was no evidence to the contrary).

The most that Mr. and Mrs. Nelson could say is that they occasionally spoke to Dwayne by phone, and each offered about a half-dozen cards they had received from their son over a period of several years. Most of Mrs. Nelson's testimony focuses on the understandable but noncompensable emotional distress she suffered as a result of Dwayne's death, and Mr. Nelson did not appear at trial (his deposition testimony was read to the jury, and he too described his emotional distress).

■ We do not doubt the parents' expressions of love, but we are unable to say that a rational person would value their lost "comfort, society, and companionship" at $2 million. The inescapable conclusion is that the jury included in its calculations some measure of damages for the parents' emotional distress, or some amount intended to punish the County for its conduct. In either event, the damage award simply cannot stand. (*Krouse v. Graham, supra,* 19 Cal.3d at p. 69 [the "cases uniformly have held that a wrongful death recovery may not include such elements as the grief or sorrow attendant upon the death of a loved one," or "compensation for sad emotions and injured feelings," or the sentimental value of the loss]; *Don v. Cruz* (1982) 131 Cal.App.3d 695, 707 [182 Cal.Rptr. 581] [a damage award is not supported by substantial evidence if it is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice]; *Fields v. Riley* (1969) 1 Cal.App.3d 308, 314 [81 Cal.Rptr. 671] [defense verdict explained on theory that "jury apparently concluded that the plaintiff-father suffered no pecuniary loss, nor did he suffer a loss of the child's comfort and society through his death" because father and son lived in different states, and saw each other but seldom]; *Ford Motor Co. v. Superior Court* (1981) 120 Cal.App.3d 748, 751 [175 Cal.Rptr. 39] ["it has long been established in California that punitive damages may not be recovered in a wrongful death action"].)

For these reasons, the damage award must be reversed.

## IV.

On her cross-appeal, Mrs. Nelson contends the trial court should have granted her motion for an award of "private attorney general" attorneys' fees. (§ 1021.5.) We disagree.[8]

---

[8] We summarily reject Mrs. Nelson's contention that the order denying her motion for fees is insufficient to permit meaningful review. The court's statement that, "respectfully," it did not "think this was an attorneys' fees case" is all that was required. (*Draeger v. Reed* (1999) 69

## A.

Section 1021.5 permits an award of attorneys' fees "to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities . . . ."

## B.

There are two grounds for Mrs. Nelson's claim. First, she points to our decision in the earlier writ proceeding, *Nelson v. Superior Court, supra,* 89 Cal.App.4th 565, where we held that her government tort claim (Gov. Code, § 911.2) "constituted actual notice to the County of a 'claim filed' and of the need to preserve recordings related to that claim as required by section 26202.6 [of the Government Code]." (*Nelson v. Superior Court, supra,* 89 Cal.App.4th at p. 573.) We remanded the matter to the trial court to fashion an appropriate remedy and, to the County, "suggest[ed] that it act with deliberate speed to develop a system to ensure that, in the future, the filing of a government tort claim in conformance with section 911.2 triggers a notice to the appropriate law enforcement agency to preserve relevant recordings of telephone and radio communications until the dispute described in the claim is resolved." (*Id.* at p. 575.) Second, Mrs. Nelson points to the changes to the TARP procedure since Dwayne's death, and she says most if not all of those changes were prompted by this lawsuit. The year after Dwayne's death, the sheriff's department revised the TARP procedures (in its own words) "[i]n response to this case," and issued a videotape to illustrate the changes.

## C.

The problem with Mrs. Nelson's position is that it ignores the fundamental purpose of section 1021.5, which is "to provide some incentive for the plaintiff who acts as a true private attorney general, prosecuting a lawsuit that enforces an important public right and confers a significant benefit, despite the fact that his or her own financial stake in the outcome would not by itself constitute an adequate incentive to litigate." (*Satrap v. Pacific Gas & Electric Co.* (1996) 42 Cal.App.4th 72, 80, [49 Cal.Rptr.2d 348].) ▪ Quite

Cal.App.4th 1511, 1525–1526 [82 Cal.Rptr.2d 378] [finding sufficient an order that "this [is] not an appropriate case for such an award"].)

plainly, the Nelsons' financial stake in the outcome of this case was substantial. In closing argument, Mrs. Nelson asked the jury for $5 million, and the jury gave the Nelsons $2 million, which we have said is too much, but we have not said anything to suggest that a retrial or settlement ought to result in an award to the Nelsons so insubstantial that it would not provide an adequate incentive to pursue this case. (*Ibid.*) For this reason, this is not the kind of case in which fees may be recovered on a private attorney general theory. (See also *California Licensed Foresters Assn. v. State Bd. of Forestry* (1994) 30 Cal.App.4th 562, 569–570 [35 Cal.Rptr.2d 396]; *Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106, 113–114 [212 Cal.Rptr. 485]; *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1414 [1 Cal.Rptr.2d 459]; *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1170 [74 Cal.Rptr.2d 510].)

The motion was properly denied.

## V.

The other issue raised on Mrs. Nelson's cross-appeal concerns the trial court's adverse summary adjudication of the survival causes of action (negligence, assault, and battery for the injuries Dwayne suffered before his death) asserted on behalf of Dwayne's estate by Mr. and Mrs. Nelson as his personal representatives. Mrs. Nelson contends her government tort claim—which shows her as the only claimant—substantially complied with the claim filing requirements.[9] We disagree.

■ An injured party may not maintain an action against a public entity unless a claim has been presented to the entity. (Gov. Code, §§ 911.2, 945.4.) Where two or more persons suffer separate and distinct injuries from the same act or omission, each person must submit a claim, and one cannot rely on a claim presented by another. (*Nguyen v. Los Angeles County Harbor/UCLA Medical Center* (1992) 8 Cal.App.4th 729, 732–734 [10 Cal.Rptr.2d 709] [claim filed for injured child does not permit parents to sue for negligent infliction of emotional distress]; *Pacific Tel. & Tel. Co. v. County of Riverside* (1980) 106 Cal.App.3d 183, 190–192 [165 Cal.Rptr. 29] [widow asserting wrongful death claim could not rely on claims filed by decedent's employer or workers' compensation carrier]; *Roberts v. State of California* (1974) 39 Cal.App.3d 844, 847–848 [114 Cal.Rptr. 518] [same]; *Shelton v. Superior Court* (1976) 56 Cal.App.3d 66, 81–83 [128 Cal.Rptr. 454] [husband and wife could not assert loss of consortium causes of action

---

[9] Mrs. Nelson's claim identified her as the claimant ("Lottie Nelson") and did not suggest her claim was made in any sort of representative capacity. Where the claim form asks for a list of the damages incurred to date, Mrs. Nelson listed "loss of son, economic losses, emotional and mental injuries, all subject to proof."

in reliance on each other's claims for their own personal injuries]; *Lewis v. City and County of San Francisco* (1971) 21 Cal.App.3d 339, 341 [98 Cal.Rptr. 407] [wrongful death plaintiffs could not rely on decedent's pre-death tort claim for her personal injuries].)

■ Because this rule is based on the purpose of the claim statutes—which is to provide sufficient information to enable the entity to adequately investigate claims and to settlement, if appropriate, without the expense of litigation (*Nguyen v. Los Angeles County Harbor/UCLA Medical Center, supra,* 8 Cal.App.4th at p. 734)—the statutory requirements have not been met by the person who has not filed a claim, and the doctrine of substantial compliance (which applies only when there is a defect in form but the statutory requirements have otherwise been met) does not apply. (*Id.* at p. 733.)

■ Since Dwayne's estate did not file a claim, and since there is nothing in Mrs. Nelson's claim to suggest it was filed in anything other than her individual capacity, and since the damages described in the claim were for "the loss of a son" (with no mention of any damage incurred by Dwayne before his death), the trial court properly resolved the survivorship claims against Mrs. Nelson.[10] We note also that Mrs. Nelson has not explained the prejudice suffered as a result of her inability to pursue a claim on behalf of Dwayne's estate, and there is nothing in the record to suggest there were any expenses (medical or otherwise) that could have been recovered by Mrs. Nelson in her role as Dwayne's personal representative. Without prejudice, we would not in any event reverse.

We summarily reject Mrs. Nelson's related contention that the County was required to notify her that her claim form was insufficient. ■ A public entity's duty to notify a claimant that the claim form is "defective" necessarily presumes the defect is disclosed on the face of the form. (Gov. Code,

---

[10] The case relied on by Mrs. Nelson, *White v. Moreno Valley Unified School Dist.* (1986) 181 Cal.App.3d 1024 [226 Cal.Rptr. 742], does not support a different conclusion. In *White,* the parents submitted a government claim for medical expenses incurred when their minor child was injured in a school-related activity. The claim described the damages as "Personal injuries to Claimant Yvonne White. Medical expenses incurred by Claimants Winford Bradshaw and Romona Bradshaw." The claim said the damages exceeded $500,000, and included medical expenses, pain and suffering, and lost earnings. (*Id.* at pp. 1026–1027.) Because all three claimants—mother, father, and child—were named in the claim, and because the separate damages claimed by the parents (medical expenses) were listed along with the damages suffered by the child, the court found the claim sufficient to permit the school to make an adequate investigation, and thus to serve the purpose of the claim filing statute. (*Id.* at p. 1032.) Mrs. Nelson's claim form did not identify the estate and did not identify herself as Dwayne's personal representative. It did not identify any damages recoverable by the estate (e.g., predeath medical expenses or other expenses suffered by Dwayne before his death). (*Gallup v. Sparks-Mundo Engineering Co.* (1954) 43 Cal.2d 1, 11 [271 P.2d 34].) There is no similarity between *White* and the case before us on this appeal.

§ 910.8.) The problem here is not that Mrs. Nelson's claim was defective, but that no claim at all was filed by or on behalf of Dwayne's estate.

## DISPOSITION

The award of damages (including interest thereon) is reversed, and the cause is remanded to the trial court for a new trial of the damage issues; in all other respects, the judgment is affirmed. The parties are to pay their own costs of this appeal.

Ortega, Acting P. J., and Mallano, J., concurred.

A petition for a rehearing was denied December 16, 2003, and the petition of appellant Lottie Nelson for review by the Supreme Court was denied February 4, 2004. George, C. J., did not participate therein.