Filed 6/18/19

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| JAMES PEARL, | B285235 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC518568) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, J. Stephen Czuleger, Judge.  Affirmed.

Michael N. Feuer, Los Angeles City Attorney, James P. Clark, Chief Deputy City Attorney, Thomas H. Peters, Chief Assistant City Attorney, Blithe S. Bock, Assistant City Attorney, Shaun Dabby Jacobs and Matthew Scherb, Deputy City Attorneys, for Defendant and Appellant.

Scolinos, Sheldon & Nevell, Todd F. Nevell, Daniel G. Sheldon; The Ehrlich Law Firm and Jeffrey I. Ehrlich for Plaintiff and Respondent.

———————————————

A jury awarded James Pearl $17,394,972, including $10 million in past and $5 million in future noneconomic damages, in his employment action against the City of Los Angeles for harassment and failure to prevent harassment and retaliation in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.). The City moved for a new trial, arguing the damages were excessive. Finding that at least some of the jury's award for past noneconomic harm was intended to punish the City rather than to compensate Pearl, the trial court conditionally granted the City's new trial motion unless Pearl agreed to a remittitur reducing past noneconomic damages by $5 million. Pearl accepted the remittitur; and the trial court denied the City's new trial motion and entered an amended judgment in the amount of $12,394,972, exclusive of attorney fees and costs.

On appeal the City contends the court abused its discretion in utilizing the remittitur procedure to reduce damages. Without challenging the jury's liability findings, the City argues that, once the court found that aspects of the jury's award were punitive, it had no choice but to grant a new trial on the limited issue of damages. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Evidence at Trial*

    a. *Pearl's evidence*

The City's Department of Public Works, Bureau of Sanitation hired Pearl in 2002 to work in the Wastewater Management Division and promoted him to supervisor in 2005. By all accounts, Pearl was a hard worker. Pearl supervised, among others, employees Lafayette Griffin and Byron Tate. In 2010 Pearl requested a disciplinary investigation of Tate,

asserting that Tate's attendance was sporadic and his work performance subpar. Tate complained to management that Pearl had favored Griffin and unfairly targeted Tate. The City twice transferred Pearl to less favorable positions while it investigated Tate's complaint. Observing that other employees had not been transferred despite complaints from their subordinates and suspecting he was the victim of race discrimination (Pearl is African-American), Pearl filed an administrative complaint with the Department of Fair Employment and Housing (DFEH) in December 2010, naming high-ranking managers Barry Berggren and Robert Potter as responsible for the alleged misconduct.

According to witnesses who testified at trial, in 2011 Potter used a software program to create an image of Griffin and Pearl embracing on a jet ski. The image, taken from Griffin's social media page, had originally depicted Griffin and a male companion on a jet ski. In Potter's edited version Pearl's head had been superimposed on Griffin's companion's body, and the blue water from the original photograph had been replaced with sewer water. Potter called two employees into his office to show them the digitally edited image and seemed proud of his editing work. The employees understood, although Potter did not articulate it, that the photograph was intended to depict Griffin and Potter as a same-sex couple. They were disappointed someone at Potter's level of management would do such a thing. The image became widely disseminated within the Wastewater Management Division. Potter boasted about maintaining it as his screensaver on his work computer.

Gerald Watson, one of Pearl's managers at the Sanitation Bureau and Potter's good friend, obtained the digitally altered image and uploaded it to his cell phone. He showed it to other

employees in the division and stated many times, "Can you believe this gay-assed shit?  Look at this gay assed motherfucker."

James Tomlin, one of Pearl's fellow supervisors at the Sanitation Bureau, complained in an email to management that management's comments about Pearl and Griffin were making him uncomfortable.  According to Tomlin, Watson habitually used homophobic slurs when discussing Pearl with others and said Pearl had "kept Griffin close" so the two could engage in oral sex in the office.

In April 2011 Pearl was transferred to a desk job, where he was ordered to "do nothing" and "stay in his cubicle."  On April 25, 2011 Pearl received notice of intent to take disciplinary action; on July 18, 2011 he was placed on administrative leave; and on August 30, 2011 he was terminated.  Pearl was told he was fired for falsifying Griffin's time reports by using an improper code and for intimidating a witness.  Pearl insisted he filled out the time reports exactly as he had been taught and denied engaging in any intimidating or improper conduct.  Pearl filed an administrative appeal challenging his termination.  Following a hearing over several days in July and August 2012, the administrative law judge found Pearl had followed procedures and the City had no basis to terminate him.  The administrative law judge recommended reinstatement, and the City did not seek review.  Pearl was reinstated on October 4, 2012.

Pearl had initially been unaware of the edited image that was circulating or the statements by Watson and others as to his perceived sexual orientation.  He had heard whispered comments such as "gay ass shit" and "homos" in his presence but did not

4

realize the slurs referred to him.  In the summer of 2012, however, he received a copy of Tomlin's email in his mailbox and learned about Watson's perpetuation of the rumors about him.  Pearl's wife, who had learned about the rumors from someone else, asked Pearl whether he had been fired for having sex with Griffin.  Pearl felt humiliated.

Pearl returned to work in October 2012.  Following Pearl's reinstatement, the disparaging comments became frequent and pervasive.  Pearl's coworkers and subordinates said to others loudly and in his presence: "The fag supervisor's back.  Here he is in the picture."  "Quit being a fag."  "That's some gay shit."  "All fags stick together."

Gabriel Fajardo, who worked under Pearl's supervision, testified people asked him after Pearl returned to work, "[H]ow does it feel working for the fag?  Are you going to stay in the office?  Don't be in the office alone with the fag."  Fajardo did not tell Pearl about these comments, and Pearl did not overhear them.  Fajardo, who had filed his own complaint against the City for discrimination, harassment and retaliation, did not report the remarks to management, explaining "it wouldn't do any good because management started it."  Over the City's objection, Fajardo also briefly testified the City retaliated against him when he attempted to exercise his rights under the Family Medical Leave Act to care for his disabled son.

Michael Bejarano worked with Pearl and in his testimony described a culture of pervasive harassment based on actual and perceived sexual orientation at times perpetrated by, and at other times silently condoned, by management.  On one occasion Bejarano complained to management after Watson's son, a Wastewater Management Division employee under Bejarano's

supervision, told him to get his "faggot ass" back in the office. Potter spoke to Bejarano and assured him the matter would be addressed. Watson's son was transferred. Three weeks later Watson's son returned to his position. Bejarano testified after his complaint the City retaliated against him by writing him up for work that had been properly performed. Meanwhile, the culture in the Wastewater Management Division persisted.

One morning Pearl arrived at work to find a corn cob, an anal sex toy and coupons for hot dogs on his desk. He did not know who had placed the items there. Rather than interceding to stop the behavior, Pearl testified, Pearl's supervisors, including Watson, either participated in it or ignored it. Pearl did not feel he had any choice other than to continue doing his job.

Two weeks after Pearl's return to work in October 2012, management directed his immediate supervisor, Bernie Rogers, to investigate Pearl for wrongdoing. When Rogers found no evidence of wrongdoing, management insisted he investigate again. Watson showed Rogers the image of Pearl and Griffin. Shortly thereafter, Watson replaced Rogers as Pearl's direct supervisor. Pearl amended his complaint with the DFEH to state a claim for harassment based on perceived sexual orientation. He continued to do his job.

In October 2013 Paul Blasman replaced Watson as Pearl's supervisor and immediately began criticizing his work. Pearl believed the criticisms were unfair and pretextual. On December 24, 2013 Blasman asked Pearl to formally reprimand Fajardo. Pearl refused, telling Blasman he would not be part of a scheme to retaliate against "an innocent man."

On December 26, 2013 Pearl experienced chest pains and fainted at work. Paramedics rushed Pearl to the hospital, where

he was treated for acute stress disorder and perniciously elevated blood pressure that had caused him to lose consciousness. Pearl had no prior history of hypertension. Pearl, then 52 years old, was placed on medical leave and has not worked since.

b. *Expert testimony on Pearl's injuries*

Dr. Darrell Burstein, Pearl's treating physician, testified that Pearl suffers from malignant hypertension, a condition caused by extremely elevated blood pressure that frequently causes irreversible organ damage. In April 2017 Pearl fainted and was diagnosed with atrial fibrillation, AFib, an abnormal heart arrhythmia that can lead to blood clots, stroke and other complications. An MRI revealed that malignant hypertension had damaged blood vessels in Pearl's brain causing a lacunar infarct. Pearl also suffers from tinnitus and hearing and vision deficiencies related to malignant hypertension and AFib. Dr. Burstein testified that, if Pearl's disease progressed, he would most likely develop early onset dementia. Dr. Burstein opined, to a reasonable degree of medical probability, that Pearl's work-related stress had caused the malignant hypertension and AFib. Pearl had no medical history of either ailment prior to the developments at work.

After meeting with Pearl and administering a battery of psychological tests and reviewing his medical and psychiatric records, Anthony Reading, Ph.D., a psychologist and former professor at the UCLA School of Medicine, testified Pearl suffers from major depressive disorder with severe anxious distress. Dr. Reading opined to a reasonable degree of psychiatric probability that the prolonged stress he experienced at work following his reinstatement had caused severe and chronic psychiatric illness.

c. *The City's evidence and theory at trial*

The City's position at trial was that no improper behavior by management had occurred. Potter categorically denied altering the photograph or circulating the edited image. Potter said he had searched Griffin's social media page and discovered a photograph of Griffin and another man on a jet ski. Believing the second man looked like Pearl, Potter handed the photograph to James Schiffhauer, who was investigating Tate's complaint against Pearl. Although Potter was not involved in the investigation of Pearl, he thought the photograph relevant. Schiffhauer told him it was not; Berggren told Potter to discard it; and Potter shredded it. He did not save it to his computer. Both Potter and Watson denied using any homophobic slurs against Pearl or hearing any, and both men claimed they would have interceded to prevent such improper workplace conduct and discipline the perpetrators if they had been aware of it. Watson expressly denied saying Pearl had kept Griffin close so they could have oral sex in the office and denied keeping any image of Pearl on his cell phone. Berggren and Watson insisted Tomlin's complaint was false, and no manager had referred to Pearl or Griffin in any derogatory manner.

The City presented no medical or psychiatric expert testimony at trial. The City attempted to introduce evidence that Pearl had been arrested in Illinois in 2012 on a drug charge while awaiting reinstatement (he was ultimately acquitted at trial on that charge) to show that factors other than the alleged harassment could have affected his mental and physical health. The court excluded that evidence as marginally relevant and unduly prejudicial under Evidence Code section 352.

## 2. *Preliminary Jury Instructions, Closing Argument and Final Jury Instructions*

At the final status conference on August 2016, the parties submitted by stipulation a list of jury instructions and attached a packet of the instructions identified. Although the list included CACI No. 3924 admonishing the jury not to include in its award any damages intended to punish or make an example of the City (see Gov. Code, § 818 [a public entity is not liable for punitive or exemplary damages]), for reasons not apparent from the record, a copy of CACI No. 3924 was omitted from the instructional packet.[1]

Nine months later, on May 15, 2017, trial began before a different judge. At trial the court and counsel engaged in extended discussion concerning jury instructions, and each side submitted additional instructions for consideration. In reviewing the proposed instructions on damages, the court stated it had in its possession CACI instructions "3900, 3902, 3903, 3903C, 3905, 3905A, 3927, 3932." The court did not mention, and neither did the parties, that CACI No. 3924 had not been included in that listing. When the colloquy was over, the parties agreed the instructions were complete. They included CACI No. 3905A,

---

[1] CACI No. 3924 provides, "You must not include in your award any damages to punish or make an example of [*name of defendant*]. Such damages would be punitive damages, and they cannot be part of your verdict. You must award only the damages that fairly compensate [*name of plaintiff*] for [*his/her/its*] loss."

9

which defined noneconomic damages.[2]  There was no discussion of CACI No. 3924, and no objection by the City to its omission.

In closing argument counsel for Pearl argued that "nothing short of $5 to $10 million" would compensate Pearl for his "pain, mental suffering, loss of enjoyment of life, physical impairment, inconvenience, grief, anxiety, humiliation and emotional distress."  Recognizing such a figure could appear high when compared to Pearl's alleged economic losses of $2 million, Pearl's counsel stated, "[I]f somebody [questions] in jury deliberations, 'Well, $2 million in out-of-pocket expenses; $10 million in harm?' explain to him and point out to him that it's because the [noneconomic harm] is the greatest harm in the case.  Again, Mr. Pearl is not entitled to a penny more or [a] penny less in damages than what will match the harm he suffered."  Pearl's counsel also told the jury that the culture at the Bureau "has been allowed to persist for a long period of time, and we're looking to change that culture through your verdict. . . .  They are paying attention to your voice here:  Is this okay, or do we need a change?"  "I can't do anything.  It's not within my power to force a change.  The judge can't even do that.  Only you have the ability to make change through your verdict."  The City did not object to these comments.

---

[2]  The jury was instructed that noneconomic damages included "[p]ast and future physical pain, mental suffering, loss of enjoyment of life, physical impairment, inconvenience, grief, anxiety, humiliation and emotional distress.  [¶]  No fixed standard exists for deciding the amount of these noneconomic damages.  You must use your judgment to decide a reasonable amount based on the evidence and your common sense. . . ."

The court gave final instructions to the jury after closing arguments. When finished, the court asked counsel for both parties whether the instructions had been properly read and whether any additional instructions were required. Counsel for the City stipulated the instructions were proper as read and responded "no" to the court's question concerning additional instructions. The jury was not instructed with CACI No. 3924.

3. *The Jury's Special Verdict*

In a lengthy special verdict the jury found Pearl was subjected to unlawful harassment in his employment based on perceived sexual orientation; Pearl's supervisors knew of the harassment, participated in, engaged in, assisted in or encouraged the harassing conduct and failed to take immediate and appropriate corrective action; and the harassment and his supervisors' failure to prevent harassment and retaliation were substantial factors in causing Pearl's harm. The jury awarded Pearl $450,053 in damages for past economic loss; $1,944,919 in future economic loss; $10 million in past noneconomic loss; and $5 million in future noneconomic loss, for a total damage award of $17,394,972.

4. *The City's Motion for New Trial*

Following the jury's verdict and the court's entry of judgment, the City timely moved for a judgment notwithstanding the verdict (JNOV) and a new trial. As to the latter motion, the City argued, among other things, Pearl's counsel's statements to "send a message" and some of the court's evidentiary rulings had inflamed the jury and resulted in an excessive and inflated damage award. The City's new trial motion did not address the omission of CACI No. 3924.

11

At the hearing on both posttrial motions, the court stated the only issue it was concerned about was excessive damages. As to that issue, it found the jury's award of past and future economic damages and future noneconomic damages amply supported by the evidence at trial. "However, two things combine to cause the court to believe that the award of $10 million for past noneconomic damages was an effort to punish the Defendant rather than to arrive at a reasonable amount of damages for that which occurred in the past to Plaintiff. [¶] The first thing is that numerous city employees and, most importantly, managers perjured themselves repeatedly during trial. Those witnesses were impeached, discredited and their stories were largely nothing but fabrications. They told those stories to protect themselves and their jobs. They had no concern for the sanctity of their oath. [¶] This perjury was apparent to me but more importantly to the jury. The court noted during trial that some of the juror's reactions to that testimony and the court feared at the time what impact it might have on its decision making."

The court continued, "There is no way of knowing for sure if the jury's reaction was intended to improperly punish the Defendant for not only the way the employees treated Plaintiff during employment but also when the witnesses for Defendant perjured themselves to cover up their improprieties. However, the amount of damages for past noneconomic damages convinces the court that punishment was on its mind and played, at least, a part. [¶] The jury returned $5 million in damages for future [noneconomic] injury. That amount is reasonable as Plaintiff will have continuing medical issues throughout his life including hearing loss, brain injury and psychological trauma. But the return of $10 million for past noneconomic damages is especially

12

high and unwarranted.  While Plaintiff returned to work and faced a difficult and harassing situation filled with sexual allegations, insults, gay jokes, gay sex toys on his desk and punitive transfers, that conduct lasted only approximately 15 months before he collapsed at work.  The period warranting damages was therefore limited to that time period.

"Adding to this court's determination that the amount herein was punitive were comments made by Plaintiff's counsel in closing argument.  While the comments were not reversible error, and were not objected to at the time, counsel did say in closing that the jury's verdict would send a message to Plaintiff's employer . . . .  That, combined with the outrageous conduct of the City's witnesses at trial in perjuring themselves, causes the court to believe that the jury doubled the noneconomic damages here.  Reduction of the $10 million to $5 million is therefore warranted under the facts of this case.  [¶]  The Court, therefore, conditionally grants the Motion for a New Trial unless the Plaintiff agrees to accept the reduced award of $5 million for past noneconomic damages.  The motion is denied in all other respects."[3]

Pearl accepted the condition; and the court denied the new trial motion and the City's motion for JNOV and entered an amended judgment in the amount of $12,394,972, exclusive of attorney fees and costs.

---

[3]     In a footnote to its ruling the court recognized, "[I]t is odd that the perjury should act here in any way to benefit Defendant.  The unanimous verdict as to liability is telling as to the initial impact of that testimony.  It was near unanimous as to damages as well.  But the court must consider its impact as it inflamed the passions of the jury."

**DISCUSSION**

1. *Governing Law and Standard of Review*

Code of Civil Procedure section 662.5, subdivision (a)(2), authorizes a court that has decided it would be proper to order a new trial limited to the issue of damages to issue a conditional order granting the new trial unless the party in whose favor the verdict has been rendered consents to a reduction of the award in an amount "the court in its independent judgment determines from the evidence to be fair and reasonable." A court exercising this authority acts as an independent trier of fact. (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 933 (*Neal*); see *Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 882 (*Collins*) [tria; court sits as 13th juror in determining whether damage award was excessive]; *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 688-689 (*Bullock*) [same].)

The authority of the trial court in ruling on a new trial motion based on excessive damages "differs materially" from review of a damage award by an appellate court. (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507; *Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 491.) In sharp contrast to appellate considerations of a claim of excessive damages on a cold record, the trial court "see[s] and hear[s] the witnesses" and can ascertain for itself "the injury and the impairment that has resulted therefrom." (*Seffert,* at pp. 506-507; accord, *Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 199 ["'[w]e have very narrow appellate review of the jury's determination of the amount of compensation for [the plaintiffs'] loss of comfort and society'"].) Accordingly, when a trial court grants a new trial on the issue of excessive damages, whether or not the order is conditioned by a demand for reduction, "the

14

presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order." (*Neal, supra,* 21 Cal.3d at p. 932; accord, *Collins, supra,* 207 Cal.App.4th at p. 882.)

We review the trial court's use of its power of remittitur to reduce excessive damages for abuse of discretion. (*Schelbauer v. Butler Manufacturing Co.* (1984) 35 Cal.3d 442, 454 (*Schelbauer*); see *Neal, supra,* 21 Cal.3d at p. 933 [when the court grants a new trial on the ground of excessive damages or requires a reduction of the amount as a condition of denying one, its "'order will not be reversed unless it plainly appears that [it] abused [its] discretion; and the cases teach that when there is a material conflict of evidence regarding the extent of damage the imputation of such abuse is repelled, the same as if the ground of the order were insufficiency of the evidence to justify the verdict'"]; *Collins, supra,* 207 Cal.App.4th at p. 882 [same].)

2. *The Trial Court Did Not Abuse Its Discretion in Conditionally Granting the New Trial Motion on Plaintiff's Acceptance of a Reduction in Damages*

The City acknowledges the trial court's broad discretion under Code of Civil Procedure section 662.5 to reduce excessive damages. However, the City insists this is not an excessive damages case but one involving a "defective verdict," namely, an improper award of punitive damages. Because punitive damages are prohibited in an action against a public entity (Gov. Code, § 818; see *Newport v. Fact Concerts, Inc.* (1981) 453 U.S. 247, 263 [101 S.Ct. 2748, 69 L.Ed.2d 616] [punitive damage awards against a municipality are against sound public policy because they "burden the very taxpayers and citizens for whose benefit the wrongdoer has been chastised"]), and such damages were "inextricably intertwined" with the jury's compensatory damage

15

award, the City argues, it was impossible for the trial court to ascertain the proper amount of damages to be awarded. Under those circumstances, the City contends, the trial court had no choice but to order a new trial on the limited issue of compensatory damages.

In *Sabella v. Southern Pacific Company* (1969) 70 Cal.2d 311 (*Sabella*) the trial court in ruling on a new trial motion reduced a jury's damage award from $115,500 to $80,000, concluding remittitur was appropriate because it had improperly excluded damage-related evidence that, if admitted, would have reduced the award. The defendant argued the trial court's use of a remittitur deprived him of his right to a full and fair hearing before a jury on all relevant evidence. The *Sabella* Court rejected that argument, concluding that, when "the only defect relates to the measure of damages, and if the appropriate amount of damages can be ascertained from the evidence, remittitur is the proper remedy to cure that defect and avoid the necessity of a new trial." (*Id.* at p. 316.)

Seizing on language in *Sabella* that remittitur is appropriate when "the amount of damages can be ascertained from the evidence" (*Sabella, supra,* 70 Cal.2d at p. 316), the City contends remittitur is improper here because any effort to parse the jury's decision and eliminate the prohibited punitive aspects of its award from lawful compensatory damages would be entirely speculative. The City's argument fundamentally misapprehends the trial court's role in ruling on new trial motions.

A trial court does not engage in a speculative exercise when it determines, in deciding a new trial motion, that a jury's damage award was the product of passion or prejudice and must be reduced accordingly. Rather, it is acting as an independent

factfinder and determining, based on the evidence presented at trial, the amount of damages that is fair and reasonable. (Code Civ. Proc., § 662.5; see *Sabella, supra,* 70 Cal.2d at p. 317; *Neal, supra*, 21 Cal.3d at p. 933; *Bullock, supra,* 159 Cal.App.4th at p. 689.) That assessment is precisely what the trial court did here when it found aspects of the jury's award for past noneconomic damages improperly punitive and conditionally granted the new trial motion, an exercise made more exacting by the jury's special verdict differentiating past and future economic and noneconomic damages. (See *American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 377 [where "elements of future damage" are in dispute "trial courts would be well advised to permit liberal use of the special verdict procedure so that individual components of the jury's future damage award can be ascertained"]; *Gorman v. Leftwich* (1990) 218 Cal.App.3d 141, 149 [same].) Far from undermining the trial court's order in the case at bar, *Sabella* supports it.

The City's reliance on *Schelbauer*, *supra,* 35 Cal.3d 442 to support its contention that the court improperly used its power of remittitur to cure a defective verdict is similarly misplaced. In *Schelbauer* the jury in a personal injury action rejected the defendant's comparative negligence defense. In ruling on the defendant's new trial motion, the court determined the plaintiff was at least 5 percent at fault and used its power of remittitur to reduce the plaintiff's award accordingly. The Supreme Court reversed, holding that the trial court's power of remittitur by statute was limited to excessive damages and could not be used as a tool to reapportion liability. (*Id.* at pp. 453-454 ["[t]he statutory requirement that use of remittitur be limited to those cases where jury error is confined to the issue of damages is

17

express and unequivocal"; "[t]he Legislature has set the boundaries beyond which a jury verdict may not be invaded by the use of a remittitur. This legislative prerogative should be respected"].)  The trial court did not reapportion liability here when it reduced the damage award.  *Schelbauer* is inapposite.

Alternatively, the City urges us to consider the trial court's decision to conditionally deny a new trial on the issue of damages in the context of Pearl's counsel's improper argument asking the jury to send a message (see *Garcia v. ConMed Corp.* (2012) 204 Cal.App.4th 144, 159 [requests that jury "send a message" are improper]; *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305 [same]) and the omission of CACI No. 3924.  It argues that, in light of these errors, there can be no question a new trial should have been ordered.  These issues are not properly before us:  The City failed to object to counsel's statements in closing argument and thrice stipulated to the propriety and completeness of the instructions, including after the court read them to the jury.  It also did not raise the omission of CACI No. 3924 in its new trial motion.  (See *Horn v. Atchison, T. & S. F. R. Co.* (1964) 61 Cal.2d 602, 610 [failure to timely object to improper statements in closing argument forfeits any appellate challenge premised on such misconduct]; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 ["'[w]here a party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal"]; *Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 ["[w]hen a trial court gives a jury instruction which is correct as far as it goes but which is too general or is incomplete for the state of the evidence, a failure to request an additional or qualifying instruction will

waive a party's right to later complain on appeal about the instruction that was given"].)[4]

Even if the City could demonstrate it had, despite these failures, preserved those issues on appeal, the trial court expressly identified both counsel's improper statements and the apparent punitive aspect of the verdict as its grounds for reducing damages. The City has not carried its heavy burden to demonstrate that the court's carefully reasoned ruling was an abuse of its discretion. (*Neal, supra,* 21 Cal.3d at pp. 932-933; cf. *Neumann v. Bishop, supra,* 59 Cal.App.3d at p. 492 ["[t]he question of misconduct was argued before the trial judge, and it must be assumed that he [or she] considered all cognizable claims now made by defendant in appraising the propriety of the verdict"; "'defendant is confronted with the rule that where the matter is presented to the trial court in support of a motion for new trial, the judge is in a better position than an appellate court to determine whether the verdict is due wholly or partially to

---

[4]     The Supreme Court has held that the trial court's failure to provide a stipulated instruction on a necessary element of the plaintiff's FEHA claim does not result in a forfeiture despite the defendant's failure to object. (See *Green v. State of California* (2007) 42 Cal.4th 254, 267 ["the failure to object does not waive any right to the instruction because it is incumbent upon the trial court to instruct on all vital issues in the case"]; see also *Manguso v. Oceanside Unified School Dist.* (1984) 153 Cal.App.3d 574, 581-582 [erroneous instruction on material element of law reversible error despite failure to object].) Because the jury was properly instructed in the case at bar on all material elements of the causes of action, including damages, *Green* does not preclude a finding of forfeiture or invited error.

19

misconduct of counsel and his [or her] conclusion will not be disturbed unless under all the circumstances it is plainly wrong"'].)

The City's reliance on authorities involving appellate review of undifferentiated damage awards misses the mark. None of those cases involved the trial court's exercise of its remittitur power in ruling on a new trial motion: In *Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1052 a jury found in favor of the plaintiff on his claims for false arrest/false imprisonment, defamation and negligent and/or intentional infliction of emotional distress and awarded damages undifferentiated by cause of action. On appeal the *Gillan* court held the plaintiff's defamation and emotional distress claims were barred by the immunity provision of Government Code section 821.6. Because the appellate court could not ascertain from the verdict the amount of damages awarded for those noncognizable claims, the court remanded for a limited retrial on compensatory damages for cognizable claims only. (*Gillan,* at p. 1052.)

Similarly, *Kellogg v. Asbestos Corp., Ltd.* (1996) 41 Cal.App.4th 1397, 1407-1408 (*Kellogg*) involved a personal injury action to the court. The plaintiff died after the case had been submitted but before the trial court had issued its decision and entered judgment. On appeal the defendant argued, and the court of appeal agreed, damages for pain and suffering were not recoverable when the plaintiff dies before judgment. Unable to determine from the trial court's decision what amount of the noneconomic damage award was for nonrecoverable pain and suffering, the *Kellogg* court reversed the judgment and remanded for a limited retrial on damages. (*Id.* at p. 1408.)

20

In *Nelson v. County of Los Angeles* (2003) 113 Cal.App.4th 783, 794, the plaintiffs sued the County of Los Angeles alleging a cause of action for the negligent/wrongful death of their son while he was in police custody.  A jury awarded damages, reduced by the percentage of their son's comparative fault; the trial court denied the County's new trial motion; and the County appealed, arguing, among other things, the $1.3 million damage award was excessive.  The *Nelson* court agreed the damages were not supported by substantial evidence.  Because "[t]he inescapable conclusion is that the jury included in its calculations some measure of damages for the parents' emotional distress, or some amount intended to punish the County for its conduct," neither of which was recoverable by the plaintiffs in a wrongful death action, the court reversed and remanded for a new trial on compensatory damages.  (*Ibid.*)

In citing *Gillan, Kellogg* and *Nelson,* the City erroneously equates an appellate court's inability to evaluate the components of an undifferentiated damage award based solely on the record on appeal with the trial court's decisionmaking role as factfinder in ruling on a new trial motion.  It makes a similar analytic error when it relies on authorities addressing the appellate court's limited power of remittitur, rather than the trial court's authority under Code of Civil Procedure section 662.5, subdivision (a)(2).  (See, e.g., *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 305 (*Bigler-Engler*) [appellate court concluded the jury's finding was influenced by passion and prejudice and exercised the court's power of remittitur to conditionally reverse for new trial on compensatory damages unless plaintiff accepted reduced award]; *Knussman v. Maryland* (4th Cir. 2001) 272 F.3d 625, 642 [holding "a new trial on damages is more appropriate than a new trial nisi

21

remittitur"]; *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.* (5th Cir. 1984) 729 F.2d 1530, 1547-1548 ["[T]he verdict is improper to the extent that it includes lost profits . . . . Remittitur would be inappropriate, however, because we cannot tell [from the general verdict] how much damage the jury awarded for the suspension period"].)

The issue presented by the City is not how our power of remittitur as an appellate court is appropriately exercised (cf. *Bullock, supra,* 159 Cal.App.4th at p. 696 [because we cannot determine how instructional error would have affected the amount of punitive damages awarded "and cannot substitute our own assessment of the appropriate amount of punitive damages for that of a jury (*or a judge on a new trial motion*) . . . remittitur by this court would be inappropriate"], italics added), but whether the trial court in its role as an independent factfinder had the authority to condition a denial of a new trial motion asserting excessive damages on Pearl's acceptance of a reduced award in accordance with Code of Civil Procedure section 662.5. It unequivocally did. (*Bullock*, at p. 689; *West v. Johnson & Johnson Products Inc.* (1985) 174 Cal.App.3d 831, 876.)

The City identifies certain evidentiary rulings at trial—the admission of evidence that others had suffered harassment or retaliation and the same managers, when alerted, did nothing to address it (so-called "me too" evidence), the admission of Fajardo's testimony the City retaliated against him when he attempted to exercise his rights under the Family Medical Leave Act and exclusion of evidence of Pearl's arrest and incarceration in 2012—to support its contention the jury verdict was the product of passion and prejudice and a desire to punish the City rather than to compensate Pearl. The City emphasizes, as it did

22

in its new trial motion, that many of the homophobic remarks about Pearl, including those to which Fajardo testified, occurred outside Pearl's presence. As discussed, we review the court's modified award, not the jury's original verdict; and the City has not shown how the court's evidentiary rulings, whether or not erroneous, were prejudicial following the court's remittitur order. To be sure, a jury may not impose punishment for conduct inflicted on other victims. (See generally *Bullock, supra,* 159 Cal.App.4th at pp. 693-694 ["a jury may not 'impose punishment' for harms suffered by nonparties to the litigation"].) However, the instructions in the case at bar made clear to the jury that it was to consider the harm to Pearl and to compensate him for actual economic and noneconomic injuries he suffered, not anyone else.

Finally, the City implores us to reduce "a colossal" $10 million award of noneconomic damages, five times the amount of Pearl's economic damages, claiming it "'shocks the conscience' and cannot stand." Once again, we are compelled to state the proper standard of review: When an appellate court reviews a jury verdict for excessive damages, it can interfere "only on the ground the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Seffert v. Los Angeles Transit Lines, supra,* 56 Cal.2d at pp. 506-507; *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 299 [same].) However, when, as here, the trial court has already conditionally granted a new trial under Code of Civil Procedure section 662.5, our review of that order is the same as that of an order granting of a new trial. All presumptions in favor of the order must be indulged (*Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 979), and the

23

order will not be reversed unless it plainly appears the court abused its discretion. (*Neal, supra,* 21 Cal.3d at p. 932; *Collins, supra,* 207 Cal.App.4th at p. 882 [the reason for this deferential standard "is that the trial court, in ruling on the motion, sits not in an appellate capacity but as a trier of fact"].)

One of the most difficult tasks imposed on a factfinder is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. (*Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893; *Bigler-Engler, supra,* 7 Cal.App.5th at p. 300; *Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 764.) The inquiry is inherently subjective and not easily amenable to concrete measurement. (See *Beagle v. Vasold* (1966) 65 Cal.2d 166, 167 ["'[t]ranslating pain and anguish into dollars can, at best, be only an arbitrary allowance, not a process of measurement"; the court can only instruct the jury to "allow such amount as in their discretion they consider reasonable" for that purpose].)

The evidence of the medical experts, undisputed at trial, was that severe and unremitting harassment had caused Pearl to suffer a "catastrophic emotional and physical breakdown" that resulted in malignant and chronic hypertension, organ damage, partial hearing and vision loss, and disabling and chronic psychiatric illness. In conditioning the denial of a new trial on Pearl's acceptance of a reduced sum for past noneconomic damages, the court, stating its reasons in great detail (see Code Civ. Proc., § 657 [a court granting a new trial, conditionally or not, based on excessive damages must specify its reasons the evidence requires a smaller verdict]), determined that an award of noneconomic damages (past and future) in the amount of $10 million was fair and reasonable, observing Pearl would suffer

24

"for the rest of his life."  We cannot say that determination, amply supported by the evidence in the record, was an abuse of the trial court's broad discretion.  (See *Daggett v. Atchison, T. & S. F. R. Co.* (1957) 48 Cal.2d 655, 666 [in assessing a claim of excessive damages, the reviewing court does not consider the question in a vacuum but based on the facts in a particular case; "it cannot be held as a matter of law that a verdict is excessive simply because the amount may be larger than is ordinarily allowed in such cases"]; *Izell v. Union Carbide Corp., supra,* 231 Cal.App.4th at p. 981 ["[t]hough we recognize the remitted amount remains on the high end of noneconomic damages," that alone "is not sufficient to second-guess the trial judge, who presided over the . . . trial and personally observed 'the injury and the impairment that resulted'"].)

## DISPOSITION

The judgment is affirmed.  Pearl is to recover his costs on appeal.


PERLUSS, P. J.


We concur:



ZELON, J.



SEGAL, J.

25