Filed 5/15/26  Harper v. Regents of the U. of Cal. CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GLENN HARPER,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>        Defendant and Appellant. | A170590, A171502<br><br>(Alameda County<br>Super. Ct. No. RG19015571) |

In May 2017, Glenn Harper was terminated from his position as a police lieutenant at the University of California Santa Cruz (UCSC) after a sergeant in the department refused to continue working under Harper's supervision.  In May 2024, a jury found that Harper's race was a substantial motivating reason for the decision to terminate Harper's employment.  On appeal, the Regents of the University of California (Regents) contend the verdict is not supported by substantial evidence, and the $6,200,000 damages award is excessive.  We conclude that the Regents fail to prove these claims of error and affirm the judgment.

## BACKGROUND

In 2019, Harper filed the underlying action against the Regents, alleging, among other things, that his termination constituted racial

discrimination in violation of California's Fair Employment and Housing Act (FEHA). (Govt. Code, § 12940, subd. (a).) When Harper's FEHA claim was tried in 2024, the jury was charged with deciding whether race discrimination was a substantial motivating reason for the Regents' decision to terminate Harper's employment.

### Summary of Trial Evidence

UCSC, one of ten campuses in the UC system, has its own police department, which employs approximately 20 officers. From 2011 through 2020, Nader Oweis was the police chief at UCSC. His responsibilities included day-to-day operations as well as hiring, firing and disciplining employees. Oweis reported to UCSC Associate Vice Chancellor Jean Marie Scott, who had administrative responsibility for the police department.

#### Harper Was Hired as a Police Lieutenant

In 2014, Chief Oweis hired Glenn Harper as his lieutenant. Harper, an African American man, received the highest score on the test for the position. Oweis selected Harper because of his extensive experience, garnered during a 26-year career at the San Jose police department. Oweis also believed Harper's interpersonal skills were "a good fit for the community." Oweis tasked Harper with helping to supervise officers and bring consistency to the department by providing training and requiring accountability and professionalism.

James Lunnen had applied for the lieutenant's position that was awarded to Harper. Lunnen, a white man, had substantial law enforcement experience and previously worked as a police sergeant and a part-time assistant district attorney in the city of Santa Cruz. Lunnen had been a sergeant at another UC campus when he was hired as a patrol officer at

UCSC. Chief Oweis subsequently promoted Lunnen when a sergeant's position became vacant, although Lunnen was not Oweis's first choice.

### Conflicts Between Harper and Lunnen

Harper made changes to UCSC Police Department policies and procedures to address issues ranging from poorly written reports to improving the department's reputation. Harper met with resistance from some "cliques" in the department, including Lunnen and two officers who worked on Lunnen's team, McConnell and Newkirk. For example, Lunnen's team complained about having to participate in training, which Harper believed was necessary so that officers could be held accountable.

In April 2016, Harper attempted to improve the department's strategy for responding to an annual "420 event" that was held on campus. On April 13, he held a meeting with his sergeants to prepare for the event. Harper discussed the importance of providing assistance to Community Service Officers (CSOs) who requested backup when responding to calls about substance abuse problems at campus housing. Harper knew that Lunnen's team in particular had not been responding to CSO requests, but he did not single them out. However, Lunnen initiated a "legal debate" about using marijuana in the dorms and stated that his team was not going to respond to CSO requests because they had no legal basis for arresting someone in a private residence. The debate turned heated, voices were raised and Harper used profanity. He called Lunnen "insubordinate," and "ordered" him to respond to the dorms. At some point, the situation diffused, and Harper attempted to clarify he was not ordering anyone to make illegal arrests but to respond to calls and use common sense. As the meeting ended, Harper and Lunnen "fist bumped" and agreed that was the best approach.

3

The following month, Harper and Lunnen had a dispute about a police matter which came to be referred to as the "Gun Incident." On the evening of May 11, 2016, Lunnen and McConnell responded to a call for assistance with an incident at a dorm involving an intoxicated female student. The student's friend reported that he was threatened by a male student who pointed a gun at him. During a search for the suspect, officers found loaded AR magazines. They left the dorm without locating the suspect or issuing any warning to the students. Before ending their shift the next morning, McConnell wrote an incident report that described the suspect's conduct as misdemeanor brandishing, and Lunnen approved the report.

When Chief Oweis arrived at work on the morning of May 12, he determined the Gun Incident had been improperly handled: the morning shift had not been notified about the matter; the written police report did not contain adequate information; Lunnen's team had classified the suspect's conduct as misdemeanor brandishing when the chief believed the suspect had committed felony assault; and the team failed to do any follow-up work prior to Oweis becoming involved.

When Harper arrived at work later that morning, he heard about the Gun Incident from a parking attendant who was afraid for his safety. The attendant had heard that the suspect had a shotgun and was possibly high on LSD and that Lunnen's team had found loaded AR magazines but did nothing about it. When Harper went to his office and saw the police report for the Gun Incident, he became angry because, in his view, Lunnen's team had "once again" minimized an event so they would not have to "do the work," and that by mislabeling the case as a low-level misdemeanor, they failed to comply with department policy and the law, which required them to put out notice of the dangerous individual.

4

Later that day, at around 5:00 p.m., Harper saw Lunnen in the locker room before Lunnen came on duty. Harper was angry and used profanity, telling Lunnen that his team mishandled the Gun Incident, that it involved a major felony, and that no alert was issued. Lunnen argued back that it was only a felony in Harper's " 'mind.' " Later, after Lunnen came on duty, Harper found him in the sergeants' office. They had a heated argument, with Lunnen insisting that Harper was "once again, overcharging things," and Harper criticizing Lunnen for not caring about the safety of the community or conducting a proper investigation. Both men yelled and Harper used profanity. Harper said he no longer trusted Lunnen to lead a team, he was going to make Lunnen an "admin sergeant," and he was going to request an Internal Affairs (IA) investigation.

### Lunnen's Complaints

On May 12, 2016, the same day Harper said he would initiate an IA investigation, Lunnen executed two "Complaint[s] of Employee Misconduct" against Harper. "Complaint # 1" pertained to the April 13 sergeants' meeting about "doing marijuana enforcement in the dorms." Lunnen accused Harper of issuing a direct order to violate UCSC students' constitutional right to privacy; of misapprehending the law; and of engaging in unprofessional conduct by yelling and using profanity when Lunnen attempted to explain the law to him. Reporting that this was not "new" behavior for Harper, Lunnen stated that he had recently been in contact with a UCLA sergeant who was yelled at and mistreated by Harper during a 2015 training session at UC Santa Barbara.

"Complaint #2" pertained to the Gun Incident, which Lunnen described as a "brandishing case." Lunnen reported that he had simply attempted to explain why he disagreed with Harper about how to charge the case. Harper,

by contrast, allegedly yelled at Lunnen, using profanity; told Lunnen that additional charges were going to be added to the police report; and threatened to start an IA investigation against Lunnen. Lunnen concluded both of his complaints by characterizing Harper as a know-it-all with little practical experience, and by characterizing his work environment as "hostile."

Lunnen personally delivered his complaints to Associate Vice Chancellor Scott. Scott responded that she would " 'need to do some consultation,' " and would get back in touch with Lunnen. On May 16, Lunnen sent Scott a lengthy email elaborating on his version of the Gun Incident, contending, among other things, that the "brandishing case" involved an unreliable victim. Lunnen defended his team's investigation, and accused Chief Oweis and Lieutenant Harper of potentially violating the law by forcing officers to alter written reports and also by taking the suspect into custody without a warrant. Lunnen told Scott that his "protest of these actions" was so "extreme" that he was submitting retirement papers. He said that he had notified the chief about his hostile working environment, but nothing was done to address the problems.

Meanwhile, Chief Oweis had decided to start an IA investigation of the Gun Incident, and to supervise Lunnen himself while the investigation was completed. Oweis retained an experienced investigator from another UC campus, who was well-suited for the job. However, when he informed Associate Vice Chancellor Scott about the matter, Scott told him to stop his investigation. Scott told Chief Oweis that he could not participate in the investigation of Lunnen's complaints against Harper because Oweis was also a subject of those complaints.

On June 6, 2016, Lunnen sent Scott an email, which adopted an informal tone. He recounted a prank that had been played on him at the

6

office, and stated, "Isn't this a great place to work?" Then he told Scott about another incident, which involved Harper "proudly" engaging in "unprofessional behavior." According to Lunnen's account, Harper had "bragged" to other officers in the department that when he attended a budget meeting on behalf of the chief, Harper made Scott so upset that she banned him from future meetings. Lunnen stated that he had not mentioned the incident in his complaint because it was no concern of his, but he thought Scott should know about it as it did concern her. Lunnen concluded his email with this observation: "This is the man the chief relies on to provide him with advice and counsel."

On June 11, 2016, Lunnen executed a third formal complaint against Harper. Lunnen reported that at some time during the prior week, Harper informed a patrol officer that Lunnen was not really retiring from the department but was resigning in order to avoid an IA investigation. Characterizing the alleged remark as slander, Lunnen complained that Harper had undermined Lunnen's ability to function as a sergeant and exacerbated the hostile working environment that he created for Lunnen.

On July 1, 2016, Lunnen left his employment with UCSC. Lunnen later testified at trial that he resigned because his "working situation became untenable" due to issues with his "immediate supervisor." The issues included "illegal orders" that resulted in Lunnen being screamed at; the fact that Harper used profanity and threatened IA investigations; and basically that Harper told him, "Obey my orders or be punished." Lunnen denied having a problem with the fact that Harper was chosen for the lieutenant's position over him. But he told the jury that he did feel that he was "probably better qualified for the position." Lunnen explained that there were "issues" with Harper's writing skills, "a lot of mistakes in his written product,"

7

whereas Lunnen "had more schooling," more experience within the UC system and "would have been a better fit." Lunnen also denied being upset that an African American had been selected for the lieutenant job, testifying he got along well with Harper until Harper began "pushing the envelope" and issuing orders Lunnen believed were illegal.

### The Investigation

In late July 2016, Assistant Vice Chancellor Scott retained a private investigator and former police chief named James Gardiner to investigate Lunnen's complaints. The appellate record contains five separately numbered incident reports that Gardiner submitted to Scott in October 2016. Each pertains to an incident involving Harper and includes a summary of excerpts from Gardiner's witness interviews. During his investigation, Gardiner conducted 56 recorded interviews, sometimes interviewing the same witness multiple times.

In his incident reports, Gardiner acknowledges his excerpts from witness interviews are "edited for continuity." Gardiner testified at trial that he decided what information from the lengthy interview transcripts to include by using his judgment to "pick out the information relevant to the investigation." For example, Gardiner testified that when he interviewed Lunnen, they discussed why Lunnen believed Harper was not an appropriate manager. Lunnen stated that Harper " 'had a fairly substantial learning disability, and he had no writing skills' "; that Harper wrote " 'like a third or fourth grader' "; and that Harper spoke " 'nontraditional English.' " Gardiner did not discuss these remarks by Lunnen in any of his reports because he did not think they reflected racial bias, and he did not view Lunnen's complaints as having anything to do with the fact that Harper is African American. Nor did Gardiner document that these statements were untrue. Harper was a

8

college graduate of such distinction that he gained admission to Georgetown Law School before deciding to pursue a career in policing, and Scott herself testified that Lunnen's characterization of Harper's writing and speaking was not true. In Gardiner's opinion, the only factor that might have caused Lunnen to be biased against Harper was that they had competed and Lunnen lost out for the lieutenant's position, but Gardiner did not mention this factor in his reports either.

The five reports in the appellate record share a common format. For each incident, Gardiner used information provided by Lunnen to identify potential policies that Harper may have violated, which Gardiner characterized as allegations. Gardiner then summarized excerpts from witness interviews that he deemed relevant, which he characterized as findings. Then he used these findings to decide whether to sustain allegations against Harper. We shall distinguish between these reports by using their respective incident numbers, which we note are not consecutive or chronological.

**Incident #2** pertained to Lunnen's complaint that Harper slandered him by telling another officer Lunnen was retiring to avoid an IA investigation. Lunnen told Gardiner that the remark was made to Officer Garcia, who recounted it to Lunnen. Harper told Gardiner that he did not recall making the comment, but it was common knowledge that Lunnen was retiring to avoid an IA investigation. Gardiner interviewed Garcia, who confirmed that Harper made the remark about Lunnen, but stated that it was made in a joking manner and Garcia did not believe it was true. Another officer who reported overhearing Harper's remark told Gardiner that it was made in a" 'matter of fact' manner."

Gardiner concluded from his investigation that Harper made a malicious statement that harmed Lunnen's reputation. Information provided by Lunnen showed that he was retiring because of confrontations with Harper and issues with management, and Gardiner found "nothing" to indicate Harper's threat to initiate an IA investigation was a factor in Lunnen's decision. Moreover, although Harper denied remembering that he made the statement, when Gardiner was investigating a different incident, Harper admitted that "he can become emotional and make statements that he later regrets." Ultimately, Gardiner sustained allegations that Harper violated department policies in this incident by disclosing confidential information about Lunnen, as well as by making a malicious statement that harmed Lunnen's reputation.

**Incident #3** pertained to Lunnen's complaint about Harper's conduct during the April 13 sergeants' meeting. Gardiner interviewed Lunnen and Harper about the incident and provided summaries of their differing recollections. Lunnen maintained that Harper gave him a direct order to violate the law by arresting students for having marijuana in their dorms, whereas Harper confirmed that he ordered the sergeants to take enforcement action in the dorms but he denied giving an illegal order.

Gardiner's report about Incident #3 summarized excerpts from interviews with three sergeants who attended the April 13 meeting. All recalled that the discussion began with Harper ordering them to respond to calls at the dorms, and it devolved into a heated debate between Lunnen and Harper about the legality of citing students for having marijuana. These witnesses all confirmed to Gardiner that they believed that following the directions Harper gave during his altercation with Lunnen would have resulted in a violation of case law. All of the sergeants stated that Harper's

behavior was inappropriate or unprofessional, and two believed Lunnen's behavior was also improper. Gardiner reported that when he asked one witness whether it was difficult to communicate with Harper, the witness said " 'yes, if you take him at face value.' " The witness explained that Harper has a very " 'direct' " demeanor, and a lot of people are very intimidated by him because he is " 'a man that has a large stature, he's an African American man.' "

Gardiner concluded from his investigation that Harper did provide direction during the sergeants' meeting which, if followed, would have violated case law; and, even though "later conversation appeared to have cancelled the direction,"[1] Harper should have known the orders he gave "were illegal." Accordingly, Gardiner sustained allegations that Harper violated department policy by (1) knowingly issuing an order or directive that would result in a violation of the law; and (2) directing a subordinate to violate a policy or directive. Neither the witnesses nor Gardiner identified the "case law" or legal precept that Harper's order is said to have violated.

Gardiner also concluded that interviews of all involved established that Harper made inappropriate and profane statements. Accordingly, Gardiner sustained a third allegation that Harper violated the department's conduct policy by disrespecting a member of the department; using obscene, indecent, profane or derogatory language while on duty; and engaging in unbecoming conduct.

**Incident #4** pertained to Lunnen's complaint about the gun incident. Gardiner determined that information provided by Lunnen supported

---

[1] Lunnen, Harper, and Chief Oweis all told Gardiner that they participated in a follow-up meeting where it was clarified that officers were not to violate search and seizure law during enforcement efforts.

allegations that Harper violated three policies: (1) knowingly giving unlawful or conflicting orders; (2) directing a subordinate to violate a department policy or directive; and (3) mistreating a member of the department, including by engaging in discourteous or disrespectful conduct and using profane or derogatory language.

Gardiner's report about incident #4 contains several pages of evidentiary findings, consisting of summaries of excerpts from multiple interviews. We do not recount that information here because Gardiner ultimately concluded that the allegation of knowingly giving an unlawful order was not sustained, and that Harper was exonerated of the allegation that he directed a subordinate to violate a policy or directive. Gardiner sustained only the allegation that Harper mistreated a member of the department, which was based on his conclusion that when Harper confronted Lunnen in front of others about mishandling the gun incident, his conduct "went well beyond any acceptable verbal admonishment of a subordinate on every level."

**Incident # 6** is not mentioned in any of the three complaints that Lunnen filed before he left the department. Instead, during one of his interviews with Gardiner, Lunnen reported that he heard about an incident when Harper searched a suspect's phone without a warrant. Gardiner interviewed multiple witnesses before concluding that Lunnen's hearsay report was a false rumor. Gardiner opined in his report that it was easy to see how the rumor surfaced and precipitated gossip, given a "virtually unanimous dislike for Harper" within the department.

**Incident # 7** related to a verbal complaint that Officer Newkirk made during an interview with Gardiner. Gardiner relayed the complaint to Scott who directed him to investigate the incident. Newkirk's complaint pertained

12

to an altercation he had with Harper in June 2016, when they were both in Irvine for training. The two were riding in the same vehicle and when they returned to the hotel, Newkirk elected to leave his training vest and radio in the car even after Harper directed him to take all of his equipment to his room. When Harper later discovered the vest in the car, he proceeded to explain to Newkirk the reasons that it was not safe to leave anything in the car, and when Newkirk disagreed, the conflict escalated, Harper used profanity and threatened to fire Newkirk.

When Gardiner interviewed Harper, Harper easily recalled the incident with Newkirk but did not recall many of the details, and he opined that he may have jokingly threatened to fire Newkirk. Harper told Gardiner that he generally allowed Newkirk to be pretty blunt with him and that he was also blunt with Newkirk, but he needed to explain that officers could not leave that kind of equipment in a car. Harper believed such conduct was a firing offense, but he did not document the incident, and he never intended to fire Newkirk. Ultimately, Gardiner concluded Newkirk's description of Harper's conduct was consistent with what others had said about Harper and sustained an allegation that Harper violated the department's conduct policy prohibiting an officer from mistreating another officer by engaging in disrespectful conduct and using profanity.

### The Decision to Terminate Harper

On January 13, 2017, Assistant Vice Chancellor Scott sent Harper a letter notifying him that the Regents intended to terminate his employment. The January 2017 notice listed six incidents, the policies Harper was alleged to have violated, and Gardiner's findings.[2] At trial, Scott testified that she

---

[2] In addition to the incidents we have discussed, Scott referenced an October 2015 training session in Santa Barbara where, according to

decided to issue the January 2017 notice after reviewing Gardiner's reports and consulting with unnamed colleagues. Scott acknowledged she did not review the available transcripts or audio recordings of witness interviews before adopting Gardiner's findings on behalf of the Regents.

The January 2017 notice advised Harper that the decision to terminate his employment would not become final until Harper had an opportunity to respond. Harper exercised his right to respond to the evidence against him, which triggered a "*Skelly*" review. (See *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194.) The *Skelly* process was administered by Jennifer Schiffner, a UCSC human resources manager. Assistant Vice Provost David Abercia was appointed as the *Skelly* officer for Harper's case.

As the *Skelly* reviewer, Abercia was tasked with evaluating the Regents' decision to issue the notice of its intent to terminate Harper. To that end, Abercia met with Harper and his counsel and obtained additional information from them by following up in writing. In addition, Abercia interviewed Scott about the Regents' investigative process. After that interview, Scott notified Jennifer Schiffner and the Regents' legal counsel that she was concerned that Abercia was biased in favor of Harper because members of Abercia's family worked in law enforcement.

Harper made two material arguments during the *Skelly* review process: his conduct did not justify termination; and Lunnen was biased against him. Harper maintained that Gardiner omitted material information from his reports that mitigated or explained Harper's conduct. He also argued that Lunnen made false, disparaging comments about Harper during his interviews with Gardiner, which disclosed Lunnen's jealousy of Harper and

Gardiner's findings, Harper used profane language and made inappropriate statements to a subordinate.

14

evinced his racial animus.  Harper supported his arguments with specific references to the interview transcripts.  For example, Harper flagged the following statement that Lunnen made to Gardiner:  " 'I have lots of documentation of the lieutenant's writing inadequacies, including ops orders that contained hundreds of errors . . . and including syntax, grammar, spelling.  He writes like he speaks and, um, his speaking is nontraditional English, I'll call it.' "

Abercia reported the results of his *Skelly* review to the Regents in an April 26, 2017 letter that was addressed to Scott and copied to Schiffner.  Based on his "analysis of the facts," Abercia determined that Harper's conduct did not justify terminating his employment.  Abercia described the matter as complex and nuanced, and he found evidence of unprofessional conduct by others in the police department, not just Harper.  Moreover, there was "a significant amount of conflicting witness" testimony about the egregiousness of Harper's behavior, and divergent views as to whether he violated department policy.  Abercia also found that Harper's conduct had been accepted and tolerated in the workplace for a significant period without any formal attempt to set behavioral expectations.  In light of these countervailing factors and the inconsistent witness testimony, Abercia recommended that the January 2017 notice be withdrawn.

On May 31, 2017, Scott sent Harper a letter notifying him that his employment was terminated.  Scott reiterated that Gardiner's investigation demonstrated Harper engaged in a pattern of unprofessional conduct, and listed again the findings that Gardiner sustained against Harper.  Acknowledging that Harper disputed those findings and that Abercia recommended withdrawal of the termination notice, Scott stated that she determined "***the termination decision will stand***."  Scott added that, in

15

her opinion, Harper's misconduct was egregious, and his behavior undermined his credibility.

At trial, Scott appeared to accept responsibility for the decision to terminate Harper, but added that she made the decision in consultation with others. Scott testified that she believes Harper is a good man based on her experience with him, and she denied that she terminated him because of his race. Scott also explained that she relied on Gardiner's incident reports, as it was not her obligation to look at the evidence or make credibility determinations. She did not follow Abercia' s recommendations because she believed he was biased in favor of Harper, and she felt that he focused too much on the "process," while failing to consider "the full scope of things."

Harper filed an administrative appeal from the decision to terminate his employment and requested arbitration so that he could clear his name and seek reinstatement. Harper felt the Regents' decision was unfair and he testified that it prevented him from getting another job in law enforcement. Harper also testified that it was his goal to become a police chief, and he had watched opportunities for those jobs pass him by while he waited for the Regents to agree to arbitration. Eventually, he filed a petition to compel arbitration but, as of the time of trial, the Regents were "still fighting it," Harper testified.

### Jury Verdict and Judgment

The trial court instructed the jury regarding Harper's claim that the Regents discriminated against him based on his race. The jury was instructed Harper had to prove three elements to establish his FEHA claim: (1) Harper's race was a substantial motivating reason for the Regents' decision to terminate his employment; (2) Harper was harmed; and (3) the Regents' conduct was a substantial factor in causing Harper harm. (See

16

CACI 2500.)[3]  The court explained that a substantial motivating reason is a reason that actually contributed to the termination decision, and that it must be more than a trivial reason, but it does not have to be the only reason motivating that decision.  (See CACI 2507.)

The jury was also instructed that even if the Regents did not hold any discriminatory intent, the Regents could still be liable for discrimination if Scott "followed a recommendation from or relied on facts by another person with discriminatory intent."  (See CACI 2511.)  The court instructed that for Harper to prove discrimination based on this theory, he had to prove that (1) "Harper's race was a substantial motivating reason for James Lunnen's complaints upon which Jean Marie Scott relied"; and (2) "James Lunnen's complaints were [a] substantial motivating reason for Jean Marie Scott's decision to terminate Glenn Harper."

On February 27, 2024, the jury was directed to return a verdict on special issues and began deliberating.  A few hours later, the jury returned a verdict finding that:  (1) Glenn Harper proved "that his race was a substantial motivating factor for his termination from the University of California Santa Cruz Police Department"; (2) The Regents would not have "terminated Glenn Harper anyway at that time, based on Glenn Harper's violation of UC Santa Cruz Police Department policies"; (3) The Regents' termination of Glenn Harper was "a substantial factor in causing him harm"; and (4) Glenn Harper's damages included $5,200,000 in economic damages and $2,000,000 in noneconomic damages.

---

[3]  The written instructions are not in the record, but the trial transcript reflects that the court utilized Judicial Council CACI instructions for FEHA claims alleging discrimination.  (See CACI 2500, et seq.)

17

In May 2024, the trial court conditionally granted the Regents' motion for a new trial as to damages unless Harper accepted a remittitur reducing his economic damages to $4,200,000. Harper accepted the reduction, resulting in an amended judgment awarding damages totaling $6.2 million. Thereafter, Harper filed a motion for attorneys' fees and costs, which was granted in part following a contested hearing. These awards were included in the second amended judgement.

## DISCUSSION

### I. The Liability Verdict

The Regents contend the judgment must be reversed because it is not supported by evidence that Harper's race was a substantial motivating factor in the decision to terminate Harper's employment. The jury specifically found otherwise, and we review that finding under the familiar substantial evidence test: "we accept all evidence in support of the judgment, draw all reasonable inferences to affirm the judgment, and may not reweigh the evidence." (*Hoglund v. Sierra Nevada Memorial-Miners Hospital* (2024) 102 Cal.App.5th 56, 75.) Actions for unlawful discrimination " 'are inherently fact-driven,' " and it is the jury, not the appellate court, that is " 'charged with the obligation of determining the facts.' " (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1218.)

#### A. Substantial Evidence Supports the Jury's Finding

The FEHA makes it unlawful for an employer to discharge a person from employment or to discriminate against a person in the terms, conditions or privileges of employment "because of" the person's race. (Gov. Code, § 12940, subd. (a).) "The phrase 'because of' means there must be a causal link between the employer's consideration of a protected characteristic and the action taken by the employer." (*Harris v. City of Santa Monica* (2013) 56

18

Cal.4th 203, 215 (*Harris*).)  The plaintiff establishes this causal link with proof that the employee's protected characteristic was a " '*substantial motivating factor motivating*' " in a termination decision.  (*Veverka v. Department of Veterans Affairs* (2024) 102 Cal.App.5th 162, 172.)

As our background summary reflects, the jury heard evidence of the following facts:  Lunnen, the UCSC Police sergeant who filed complaints demanding an investigation of Harper, was afforded a direct line of communication with Associate Vice Chancellor Scott, the Regents' ultimate decision maker.  During the investigation that Scott oversaw, Lunnen made false, offensive statements about Harper that were consistent with implicit bias and racial animus.  Gardiner, the IA investigator, excluded evidence of Lunnen's bias from his reports and also credited the view that it was difficult to interact with Harper because he is a large African American man with a direct demeanor.  Scott adopted Gardiner's findings without any independent consideration of the evidence, and she continued to rely on those findings after Lunnen's racial animus toward Harper was brought to her attention.  By contrast, Scott disregarded the findings and recommendation of David Abercia, the Regents' *Skelly* reviewer, including Abercia's finding that Gardiner's investigation resulted in conflicting evidence about the severity of Harper's misconduct and implicated other members of the UCSC Police Department who were not subject to investigation or discipline.

We conclude that these factual circumstances, and reasonable inferences drawn therefrom, substantially support the jury finding that Harper's race was a substantial motivating factor in the decision to terminate his employment.  The Regents contend otherwise.  Paying little more than lip service to our standard of review, the Regents attempt to chip away at the evidence that establishes their liability for violating the FEHA.

## B. The Jury Did Not Have To Find The Regents' Proffered Reasons Were False or Pretextual

The Regents' threshold argument is that Harper did not meet his burden of proof under the three-stage burden-shifting test for evaluating discrimination claims established by *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. The *McDonnell Douglas* test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354.) The Regents argue that discrimination cannot be inferred from the trial evidence in this case because they established a presumptively valid reason for terminating Harper, and Harper failed to prove that reason was a pretext for discrimination.

The Regents' argument fails because the *McDonnell Douglas* burden-shifting test does not apply to our review of the jury's verdict in this case. (*Harris*, *supra*, 56 Cal.4th at pp. 214–215; see also *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 111 & fn. 11 (*Reeves*) [" 'pretext' is merely one way of raising an inference of discrimination—not an indispensable precondition to such an inference"].) As our Supreme Court explained in *Harris*, the *McDonnell Douglas* test "presupposes that the employer has a single reason for taking an adverse action against the employee and that the reason is either discriminatory or legitimate. By hinging liability on whether the employer's proffered reason for taking the action is genuine or pretextual, the *McDonnell Douglas* inquiry aims to ferret out the 'true' reason for the employer's action." (*Harris*, at p. 215.) But in cases tried on a theory that the employer had "mixed-motives" for the employment decision, there is "no

20

single 'true' reason for the employer's action," and thus the *McDonnell Douglas* burden-shifting test does not apply. (*Harris,* at p. 215.) To establish liability in a mixed-motive case, the plaintiff must show instead that " 'an illegitimate criterion was a *substantial factor* in the particular employment decision.' " (*Id.* at p. 232.) Requiring proof that discrimination was not just a motivating factor but a substantial one, ensures there is a sufficient basis for imposing liability and furthers "the deterrent purpose of the FEHA" by exposing the employer to liability "even if other factors would have led the employer to make the same decision at the time." (*Ibid.*)

This case was tried as a mixed-motive case, as reflected in the jury instructions and special verdict form, neither of which are challenged on appeal. As the jury was instructed, Harper had to prove that race was a substantial motivating factor in the decision to terminate his employment. Contrary to the Regents' appellate arguments, Harper did not also have to prove at trial that the Regents' proffered reason for the employment decision was false or pretextual.

Taking a different tack, the Regents argue that even if the *McDonnell Douglas* test does not apply, Harper failed to prove that race was a substantial motivating factor in the termination decision because there is no evidence that any decisionmaker harbored a discriminatory motive. According to this argument, (1) uncontradicted evidence establishes that Associate Vice Chancellor Scott had no discriminatory motive; and (2) only Scott's motivation matters because she was the sole decisionmaker. Both prongs of this argument fail, as we shall explain.

### C. Scott's Personal Motivation

As the Regents contend, Scott testified that she did not terminate Harper because of his race. But the jury heard Scott's testimony and was the

21

sole judge of her credibility. (See *Vasquez v. LBS Financial Credit Union* (2020) 52 Cal.App.5th 97, 109 [substantial evidence review applies to implied findings; courts do not evaluate credibility but defer to trier of fact].) Moreover, the jury heard evidence that Scott made decisions throughout the investigation that could have been influenced by the fact that Lunnen is white and Harper is African American.

For example, Scott did nothing to rebuff Lunnen's efforts to influence her personally even after Lunnen attempted to prejudice Scott against Harper. At the same time, Scott made the decision to preclude Chief Oweis from conducting an IA investigation into the conduct of both Harper and Lunnen, choosing to focus only on Lunnen's complaints against Harper. Scott also barred Chief Oweis, who is reportedly of Palestinian descent, from participating in the investigation as a decisionmaker even though he was Harper's immediate supervisor. And later, after evidence suggesting Lunnen's racial animus toward Harper emerged during the *Skelly* review, Scott failed or refused to consider how that factor affected the IA investigation, even after the *Skelly* reviewer disputed that Gardiner's findings justified terminating Harper's employment.

The Regents suggest multiple potential justifications for various decisions that Scott made during the investigation, arguing, for example, that Scott was not required by law to follow the recommendation of the *Skelly* interviewer. (Citing *Titus v. Civil Service Com.* (1982) 130 Cal.App.3d 357, 362.) These arguments miss their mark because they have no bearing on our substantial evidence review, which focuses on evidence that supports the judgment as opposed to evidence that might arguably have supported a different outcome. (See e.g., S*utter's Place, Inc v. City of San Jose* (2024) 104 Cal.App.5th 855, 868; *Lobo v. Tamco* (2014) 230 Cal.App.4th 438, 442.)

22

Accordingly, we conclude that, contrary to the Regents' argument on appeal, the trial evidence did not foreclose the jury from finding that Harper's race influenced Scott's decisionmaking.

**D. The Cat's Paw Theory**

We also reject the Regents' contention that Scott's personal motivation is the only evidence that is relevant to the jury's finding. Harper's FEHA claim was based in part on the "cat's paw" doctrine, which holds that even if the decisionmaker did not act with discriminatory intent, the defendant may be liable for discrimination if the decisionmaker acted on information that was provided by another person who was acting out of discriminatory animus with the objective of causing the adverse employment action. (*Reeves*, *supra*, 121 Cal.App.4th at p. 100; *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1536 (*McGrory*).)

The cat's paw doctrine comes into play when a "biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." (*Hoglund v. Sierra Nevada Memorial-Miners Hospital*, *supra*, 102 Cal.App.5th at p. 76.) This rule rests on the principle that the ultimate employment decision should not be assessed as a " ' " ' "watertight compartment, with discriminatory statements in the course of one decision somehow sealed off from . . . every other decision." ' " ' " (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551 (*DeJung*).) Thus, evidence that a "significant participant" in the employment decision exhibited unlawful animus supports an inference that the decision itself was discriminatory. (*Ibid.*; *Hoglund*, at p. 76.)

These principles are reflected in CACI 2511, which formed the basis of the cat's paw instruction delivered to the jury in this case. That instruction

required Harper to establish a causal link between Lunnen's discriminatory motive and the Regents' employment action by proving that Harper's race was a "substantial motivating reason" for Lunnen's complaints, and that those complaints were a "substantial motivating reason" for Scott's decision to terminate Harper. The Regents do not challenge this jury instruction.

Instead, they contend there is no substantial evidence Lunnen was motivated by racial bias, and in any event, whatever bias Lunnen may have harbored did not proximately cause Harper's termination. We reject both arguments.

First, we are not persuaded that Lunnen's complaints were not racially motivated. The Regents characterize his complaints as a "natural response" to the way Harper treated Lunnen, and they posit that the untrue, derogatory statements that Lunnen made about Harper during the IA investigation showed only that Lunnen disliked Harper. Suffice it to say, the jury was not compelled to draw such conclusions from the evidence. After listening to and observing the demeanor of Lunnen, Harper, and other witnesses at trial, the jury could reasonably have concluded that racial bias was a substantial motivating reason for Lunnen's complaints.

Second, we conclude the Regents' proximate causation arguments are not properly before this court in the form they are presented here. Citing language drawn from state and federal cases, the Regents present a three-pronged appellate argument on proximate causation. The Regents contend they are not liable because Lunnen was Harper's subordinate, not his supervisor, suggesting that the cat's paw doctrine does not apply " 'where the only actor possessing the requisite animus is a nonsupervisory coworker.' " (Citing *Reeves, supra,* 121 Cal.App.4th at p. 109, fn. 9.) They also contend an independent investigation such as the one Gardiner undertook "breaks the

24

causal link between the biased employee and the decisionmaker's adverse employment action." (Citing *Vasquez v. County of Los Angeles* (9th Cir. 2003) 349 F.3d 634, 640.) And finally, they contend that because Scott exercised her own judgment in deciding to terminate Harper's employment, she was "*not* a mere conduit or instrumentality of the purportedly biased subordinate." (Citing *McGrory*, *supra*, 212 Cal.App.4th at p. 1536.)

With these arguments, the Regents are offering up legal principles they purport to have extracted from case law, and they urge us to measure the sufficiency of Harper's evidence against these rules. But because the jury was not instructed on these principles, we decline the invitation. An appellate court must "review the sufficiency of the evidence to support a verdict under the law stated in the instructions given, rather than under some other law on which the jury was not instructed." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 674–675.) This is so because in a civil proceeding it is each party's obligation to "request complete and comprehensive instructions on its theory of the case; if a party fails to do so, the court ordinarily has no duty to instruct on its own motion. [Citations.] The jury's responsibility is to decide factual issues and return a verdict in accordance with the law as instructed by the court. [Citations.] Absent instructional error, which [defendant] does not argue, *for an appellate court to review a verdict under a rule of law on which the jury was not instructed would allow reversal of a judgment on a jury verdict, requiring a retrial, even though neither the jury nor the court committed error.*" (*Id.* at p. 675, italics added; see also *Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535 ["where a party to a civil lawsuit claims a jury verdict is not supported by the evidence, but asserts no error in the jury instructions, the adequacy of the evidence must be measured against the instructions given the jury"].)

Measuring the evidence in support of the judgment against the instructions as given to the jury here, we must reject the Regents' arguments. The jury was not instructed that the cat's paw theory required racial animus in a supervisor, or even racial animus in a person who was a "significant participant" in the adverse employment decision. (See *DeJung*, *supra*, 169 Cal.App.4th at p. 551.) Instead, the jury was simply asked to determine whether "race was a substantial motivating reason for *James Lunnen's complaints* upon which Jean Marie Scott relied," and whether "*James Lunnen's complaints* were [a] substantial motivating reason for" Scott's decision to terminate Harper. (Italics added.) The Regents having conceded for purposes of instructing the jury that cat's paw liability could be based on "James Lunnen's complaints," they cannot now prevail by arguing the opposite.

Also unsuccessful is the Regents' argument that, if Lunnen harbored racial bias, there is no substantial evidence his bias was a substantial cause of the Regents' adverse employment action. The jury was instructed that it had to find Lunnen's complaints were "substantial motivating reasons" for Scott's decision to terminate Harper. Their finding on that point is amply supported by evidence of the pivotal role Lunnen played in the process that resulted in Harper's termination. Lunnen personally delivered his complaints to Scott, which Scott then used to shield Lunnen from becoming a co-subject of the IA investigation that Chief Oweis had already initiated. Lunnen's complaints became the "information" that Gardiner used to determine "allegations" against Harper and to frame the investigation he conducted on behalf of Scott. Lunnen also provided Gardiner with much of the material evidence that resulted in Gardiner's findings. And Scott continued to rely on Gardiner's findings without conducting her own review

26

of the evidence, even after the *Skelly* reviewer concluded Gardiner's investigation failed to establish that Harper's offensive language and management style justified termination.

Thus, we reject the Regents' contention that any causal link between Lunnen's racial bias and Scott's employment decision was broken by Gardiner's *independent* investigation and Scott's reliance on her *independent* judgment. The Gardiner reports we find in this record constitute substantial evidence that Gardiner relied heavily on Lunnen's accounts to reach his findings. Moreover, Gardiner made the decision to omit evidence of Lunnen's racial bias and professional jealousy from his reports. Gardiner also elected to include in one report the impression that other officers had difficulty communicating with Harper because he is a large African American man with a direct management style. Considering these circumstances, the jury could reasonably have found that Gardiner's investigation forged the causal link between Lunnen's bias and Scott's decision to terminate Harper, and that Scott's judgment was substantially infected by Lunnen's racial bias.

In sum, we find no basis for disturbing the jury's verdict on liability.

## II. The Damages Award

The Regents contend that the $6.2 million damages award is excessive and unsupported by the evidence, notwithstanding that the trial court reduced by $1 million the amount of economic damages the jury awarded. "[W]hen, as here, the trial court has already conditionally granted a new trial under Code of Civil Procedure section 662.5, our review of that order is the same as that of an order granting of a new trial. All presumptions in favor of the order must be indulged [citation], and the order will not be reversed unless it plainly appears the court abused its discretion." (*Pearl v. City of Los Angeles* (2019) 36 Cal.App.5th 475, 491.)

27

To the extent the trial court based its decision on findings of fact, those findings are reviewed under the same substantial evidence test that would otherwise apply to the jury's verdict. (*Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 878.) Under that standard, the " ' "evidence is insufficient to support a damage award *only* when no reasonable interpretation of the record supports the figure." ' " (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 738 (*Atkins*), italics added.)

## A. Additional Background

The jury was instructed that if Harper proved his FEHA claim, the jury needed to decide how much money would "reasonably compensate" Harper for the harm caused by the Regents' wrongful conduct, and that damages should be awarded for "each item of harm . . . even if that harm could not have been anticipated." (See CACI 3900.) Moreover, the jury was told, Harper did not have to prove the exact amount of damage, but the jury was instructed not to speculate or guess in awarding damages.

Harper claimed economic and noneconomic damages as a result of the Regents' wrongful conduct, and his claim for economic damages included compensation for past and future lost wages. The instructions about these issues included a version of CACI 3903P, which addresses damages resulting from an employer's wrongful discharge. Thus, the jury was told that to calculate past wage losses, it needed to decide the amount Harper would have earned to date, "including any benefits and pay increases." And to calculate future losses, the jury needed to determine the present cash value of "any future wages and benefits that [Harper] would have earned for the length of time the employment with the Regents was reasonably certain to continue." The court gave the jury a list of things to consider in order to determine the period that employment was reasonably certain to continue, including the

28

plaintiff's age, work performance, and intent regarding continuing that employment.

During closing arguments to the jury, plaintiff's counsel argued that Harper's earnings at the time of termination were not limited to his salary, and urged the jury to also account for Harper's benefits by applying a multiplier of between 20 and 40 percent, which would establish a "ballpark" amount. Counsel emphasized that the jury did not have to be "exact" when calculating the amount of lost wages or the number of years Harper would have continued working. So too for the amount that would compensate Harper for mental and emotional distress, counsel argued, and then queried, "What number above $5 million will fairly compensate my client?"

During the Regents' closing argument, defense counsel addressed damages only briefly, contending that "there are no damages in this case," and that Harper was not distraught at his termination but had spent his time preparing his legal case. Defense counsel continued: "Remember he worked eight days in seven years, and yet he's coming here asking you to award something over $5 million. He has done nothing to look for a job other than to submit two applications." Defense counsel argued forcefully that Harper failed to mitigate his damages, but counsel did not directly challenge the amount of damages that Harper sought to recover.

As we have noted, the jury returned its verdict on a special verdict form. The jury was asked to make separate findings regarding economic and noneconomic damages, and it awarded $5.2 million in economic damages and $2 million in noneconomic damages. The jury was not directed to apportion damages between current and future losses or otherwise to apportion damages.

In March 2024, the Regents moved for a new trial on multiple grounds, including excessive damages. They maintained that the trial court, sitting as the 13th juror, should, "at a minimum," order a new trial unless Harper agreed to a "significant remittitur." Regarding economic damages, the Regents argued the plaintiff's evidence showed only that Harper was earning between $160,000 and $170,000 annually, and there was no evidence that amount would have increased in future years. The Regents speculated that even if the jury assumed a three percent annual increase and that Harper would have worked 10 more years, his total damages would be no more than $2,000,000. The fact that the jury awarded so much more signaled to the Regents that the jury had been influenced by plaintiff's trial strategy to " 'send a message' with their damages award." The Regents argued that noneconomic damages were also excessive because Harper's emotional distress was not severe.

Harper disputed that the award was the result of passion or prejudice, arguing it was reasonable and supported by the evidence. Regarding economic damages, Harper argued the jury could have concluded that, as of the time of trial, Harper's past damages totaled close to $2 million based on evidence that his total annual compensation at the time of termination was approximately $200,000; that he had a reasonable expectation of becoming a police chief, a position that became available at UCSC in 2021; and that becoming a police chief would have further increased his total annual compensation to approximately $300,000. As for future economic damages, Harper argued, the jury could reasonably have found these totaled $3 million by finding that he would have continued work for another ten years. Moreover, Harper argued that noneconomic damages were supported by

evidence that his discriminatory firing devasted him and prevented him from getting another position in law enforcement.

The trial court ruled on the new trial motion during a May 9, 2024 hearing, and it rejected all of the Regents' other claims before addressing whether damages were excessive. The court agreed with Harper that the evidence supported the economic damages award if the jury had concluded that Harper, who was 63 at the time of trial, would have continued working for another ten years thereafter. Acting as the 13th juror, the court disagreed with that finding, and thought it more reasonable to anticipate that Harper would have retired when he turned 70, which was seven years after trial. Accordingly, the court ordered that it would conditionally grant the Regents' motion for a new trial unless Harper agreed to reduce the amount of the economic damages award by $1 million. In making this order, the court emphasized that it had sat through the entire trial, heard all the evidence, and believed the jury's decision was supported by the evidence.

The Regents objected that the reduced economic damages award was still excessive because plaintiff presented no evidence to establish the number of additional years Harper intended to work. The court agreed there was no evidence about the specific number but pointed out there was evidence that Harper loved his job, and was planning on working for a long time. Thus, the court did not further reduce the award.

The trial court's ruling was memorialized in a brief written order: "After hearing the oral arguments of both parties, the Court issued a ruling conditionally granting the motion with remittitur reducing the economic damages awarded by the jury from $5.2M to $4.2M with the expectation that Plaintiff will retire at the age of 70 years. [¶] Plaintiff shall notify the Court if Plaintiff is agreeable with the Court's conditional ruling." A few days later,

31

Harper accepted the reduction of economic damages, and the judgment was amended accordingly.

### B. Analysis

The Regents contend that (1) the reduced economic damages award is not supported by the evidence, and (2) the award of noneconomic damages is inextricably intertwined with the economic damages award. We shall reject prong (1) of this argument which means prong (2) also fails.

The Regents challenge the economics damages award on three grounds. They argue first that there is no substantial evidence that Harper's total annual compensation at the time of termination was $200,000, contending instead that Harper himself testified his annual salary with benefits was less than $170,000. The record is not so clear. When Harper was asked for his "base salary" at the time of termination, he testified it was "roughly" or "probably," with benefits, between $160,000 and $170,000. However, Harper's earnings statements, admitted at trial without objection, reflect that when Harper was terminated, his monthly salary was $11,586, which shows his annual salary was more than $139,000. Moreover, Harper also testified that employees in his department received, in addition to their base salary, benefits that were valued at 40 percent their base salary. This 40 percent upward adjustment was undisputed at trial. The Regents' damages expert did not offer an opinion as to Harper's total compensation at the time of termination, but he did confirm that public employees generally receive benefits that are equivalent to between 30 and 40 percent of their compensation. We conclude this evidence and reasonable inferences drawn therefrom substantially support the finding that Harper's total annual compensation at termination was approximately $200,000.[4]

---

[4] The precise number is a touch lower: $11,586 x 12 x 1.4 = $194,645.

The Regents next argue that the damages award rests on a series of unsupported assumptions: that Harper would have become the police chief at UCSC when Oweis retired; that his total compensation would have increased to approximately $300,000 at that time; and that he would have received annual increases thereafter. In presenting these cursory arguments, the Regents do not identify evidence that is inconsistent with these inferences and we conclude they are supported by the record. The jury heard undisputed evidence that before Harper was employed at the UCSC Police Department, he had a long and successful career in law enforcement. The plaintiff also showed that Harper applied for the lieutenant position because he wanted to become a police chief; when he was awarded the position, he became second in command to Chief Oweis; and before he was terminated he had a reasonable expectation that he would replace Oweis when Oweis retired. Nothing was certain, as the Regents' had historically conducted multi-candidate searches for the position, but even Scott acknowledged to the jury that when Oweis retired in December 2020, Harper could have been appointed interim chief, had he not been terminated. And Harper produced evidence of the salary and benefits that were paid to the individual who actually became the interim chief after Oweis retired.

The Regents' third argument pertains to the finding of the trial court in its role as a 13th juror; the Regents challenge the court's finding that Harper would have continued working at UCSC until age 70, had he not been wrongfully terminated. Although we consider this issue close, we conclude the finding is supported by substantial evidence. There was undisputed evidence that Harper had loved his job and had not made any plan to retire, and that becoming a police chief had long been his ultimate career goal. The trial court acknowledged that a friend of Harper, who testified at trial,

33

recalled Harper once saying that he felt he had "another ten years" to work his way up the department hierarchy. But, as the 13th juror, the court was not persuaded the friend's testimony was dispositive. Instead, the court emphasized evidence that Harper loved his job and "was planning on doing it for a long time" as support for finding that Harper would have continued to work at UCSC until the "normal retirement age" of 70, if not for his unlawful termination.

Because we find substantial evidence supports the economic damages award, we also reject the Regents' contention that these damages are speculative. As the jury was instructed, a damages award must not be speculative. (*Atkins*, *supra*, 8 Cal.App.5th at pp. 705, 738.) This principle does not require that the amount of damages be proven with absolute certainty. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 774 [" '[w]here the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty' "].) However, the award must be predicated on something other than a mere possibility. (*Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 602; see e.g. *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 695 [no evidence supported expert's assumption the at-will employee would have continued employment with defendant or other employer at comparable salary].) Requiring plaintiffs to show their prospective economic losses are reasonably certain " 'ensures that the jury's fixing of damages is not wholly, and thus impermissibly', speculative." (*Atkins*, at p. 738.) The jury's finding that Harper made this showing is supported by the substantial evidence we have discussed.

Finally, the Regents contend the damages award is excessive because the jury inflated the amount of Harper's damages in response to improper

34

arguments made by defense counsel during closing arguments. As support for this argument, the Regents rely on cases that have considered "whether improper attorney argument tend[s] to show that a damages award was the product of passion or prejudice, even where an attorney misconduct claim has not been preserved for appeal." (*Burchell v. Faculty Physicians & Surgeons etc.* (2020) 54 Cal.App.5th 515, 531.) Here, the Regents contend that plaintiff's counsel made a series of remarks to the jury, which, when construed together, constitute misconduct because they encouraged the jury to award damages based on factors other than the evidence. However, the challenged remarks were not part of a single argument, and we think it important to consider them in context.

One theme of plaintiff's closing argument was that Harper's misconduct was minor and that a white officer engaging in such conduct would not have been terminated. In that context, counsel argued that the reason for the harsh discipline was because Harper "didn't know his place," and added "some of you on this jury know exactly what I'm talking about." We are not persuaded these remarks constituted misconduct. "Counsel is granted wide latitude to discuss the merits of the case, both as to the law and facts, and is entitled to argue his or her case vigorously and to argue all reasonable inferences from the evidence." (*Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 305 (*Nishihama*).) Moreover, even if counsel should not have alluded to the personal experiences of members of the jury, courts have long recognized that "[j]urors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself." (*Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 741.) Regardless, these allegedly objectionable remarks

had nothing to do with damages, and when viewed in context, they do not support the Regents' contention that the damages award was inflated.

The Regents also direct us to a part of the closing argument when plaintiff's counsel began discussing a book that "talks about how we have a caste system in America that's based on race." The Regents' trial counsel interrupted that argument by requesting a sidebar. Thereafter, the court admonished the jury to disregard comments about their own personal experiences. Dissatisfied with the admonishment, defense counsel accused plaintiff's counsel of "pandering to the jury," which led to a heated exchange between counsel, of which there were many during the very contentious trial. Assuming counsel's book discussion was improper, the jury was instructed to disregard it, and that admonishment seems sufficient, especially since this argument, too, was unrelated to damages.

Finally, during a subsequent argument that did pertain to damages, plaintiff's counsel suggested that the jury send a message. Counsel stated that the jury was not to award punitive damages, but a "full and fair verdict." He told the jury that a partial award was not full damages, and continued: "I submit to you, ladies and gentlemen, that your full and fair verdict will send a message to the Regents. And the message is going to—" Defense counsel then objected, but plaintiff's counsel clarified he was stating only that "full and fair compensation will send a message." Again, the argument may not have been improper. To be sure, a "suggestion that the jury should 'send a message' by inflating its award of damages . . . would be improper where, as here, punitive damages may not be awarded." (*Nishihama, supra*, 93 Cal.App.4th at p. 305.) However, plaintiff's counsel did not suggest that the jury inflate its award. He urged them to send a message by awarding full and fair damages. Moreover, as we have concluded, the damages that were

36

ultimately awarded to Harper are supported by substantial evidence.  Thus, we reject the Regents' contention that the award was the product of passion or prejudice.

## DISPOSITION

The judgment is affirmed.  Respondent may recover costs on appeal.

TUCHER, P. J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*Harper v. The Regents of the University of California* (A170590 A171502)